In re NETWORK ASSOCIATES, INC.,
SECURITIES LITIGATION.

and Consolidated Cases.

No. C 99–01729 WHA.

United States District Court,
N.D. California.

Nov. 22, 1999.

Reed R. Kathrein, William S. Lerach, Millberg, Weiss, Bershad, Hynes & Lerach LLP, Roger W. Kirby, Randall K. Berger, Kirby, McInerney & Squire LLP, for Network Associates.

Joseph Weiss, Kevin J. Yourman, James E. Tullman, Weiss & Yourman, Michael D. Braun, Stull, Stull & Brody, for Network Institutional Group.

Sheldon L. Albert, Barrack, Rodos & Bacine, for Board of Pensions and Retirement of City of Philadelphia.

Glen W. Schofield, Allen Ruby, Ruby & Schofield, James McManis, Colleen Duffy Smith, McManis, Faulkner & Morgan, for Robert A. Vatuone.

Boris Feldman, Nina F. Locker, Keith E. Eggleton, Wilson, Sonsini, Goodrich & Rosati, for Network Associates.

## MEMORANDUM OPINION

## APPOINTING LEAD PLAINTIFF

### (AMENDED)

ALSUP, District Judge.

### INTRODUCTION

For two-thirds of a century, the federal securities laws have protected the integrity of the capital markets in America, in part through the policing effect of private securities class actions. Due to perceived abuses in such litigation, however, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"). One of its central provisions calls for the district court to appoint a "lead plaintiff" in such cases. This provision, and its proper application, are at issue in three competing motions for such appointment in this case. One of the pivotal legal issues is whether a "group" of unrelated investors with no decisionmaking structure and no connection other than counsel can qualify as a candidate for lead plaintiff under the PSLRA. For the reasons set forth below, the Court holds that such artificial "groups" may not so qualify.

## STATEMENT

This set of consolidated actions arose out of a series of declines in the price of the common stock of Network Associates, Inc., earlier this year.[1] The complaints allege accounting fraud and insider trading. The fraud supposedly began in January 1998 and continued until April 1999 when the truth, it is said, finally came out. During the alleged fraud, the common stock price rose as high as $67. At the end of the ride, the price dropped to the $13 to $16 range. Twenty-five suits promptly followed, nineteen of which were brought as class actions. Three motions to appoint lead counsel emerged.

On April 7, 1999, the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and the Law Offices of Steven E. Cauley, P.A. (of Little Rock, Arkansas), filed Action No. C–99–1729 on behalf of Frank W. Knisley and Joel Harmon, individuals who invested about $3000. Through a process described below, the Milberg firm has joined forces with Kirby, McInerny & Squire, LLP, and Barrack, Rodos & Bacine, and they now claim to represent over 1725 investors who acquired Network securities from January 20, 1998, through April 19, 1999, and who collectively lost at least $33,929,308. Designating all 1725 (or more) as "movants," these law firms seek to appoint a smaller group of ten investors as lead plaintiff in these consolidated actions, calling these ten unrelated investors "The Network Associates Lead Plaintiff Group." The ten investors lost a combined total of at least $10,213,115, according to counsel. The ten consist of two equity funds, a city, six individuals and a family trust. In short, although the motion purports speak for over 1725 movants, it seeks the appointment of ten unrelated investors as lead plaintiff.

Also on April 17, 1999, the law firms of Weiss & Yourman and Stull, Stull & Brody filed Action No. 99–1731 on behalf of Philip E. Wetzel, an individual, who also lost about $3000. Through the process described below, these law firms now claim to represent over 100 institutions and thousands of individuals that acquired Network securities and lost over $120 million during the same class period described above. One institution represented by these firms allegedly suffered the single largest loss of any investor, although the claimed amount has proved to be a moving target, roaming from as high as $24 million to, after scrutiny, considerably less. The law firms call their long list of purported clients the "Network Institutional Group." They move on behalf of that group to appoint it as lead plaintiff. For "administration and efficiency," however, the motion proposes nine different investors with losses allegedly ranging from $3348 to over $24 million to serve as "representative lead plaintiffs."

The law firms of Ruby & Schofield and Manis Faulkner & Morgan, both of San Jose, represent Robert A. Vatuone, an individual, and seek his appointment as lead plaintiff. Mr. Vatuone is the named plaintiff in Action No. C99–2686. He lost at least $23,500. He does not advance any "group" and seeks the post in a solo capacity.

Since the filing of these actions, a vitriolic competition has been waged between the Weiss faction and the Milberg faction. Both published (and repeatedly republished) notices of the suit and sought to accumulate as many investor forms as possible so as to claim to represent the larger total of aggregate losses. Both have accused the other of unethical, avaricious, illegal and mean-spirited wrongdoing. Each say the other is unworthy to represent a class. To the extent relevant, this history is discussed below.

## DISCUSSION

### Aggregation of Claims Into Groups

█ A principal issue presented by these motions is whether "groups" like

---

1. Case Nos. 99–2686 and 99–4137, previously related, are now also ordered consolidated

with the rest.

those proposed here may serve as the lead plaintiff under the PSLRA (or have any standing to move to appoint a subgroup). The PSLRA was provoked by a widespread perception that securities class actions had become "lawyer-driven," *i.e.*, that such litigation had been typically initiated and controlled by plaintiff's counsel, bark to core, start to finish. Congress found that the named plaintiffs, while ostensibly in charge of the litigation as fiduciaries for all similarly situated, were, in reality, token figureheads with no actual control over their cases. In the vast run of cases, it was the lawyers who initiated them, selected the plaintiffs, controlled the strategy, controlled the settlement, and collected fees from the settlement—or at least so Congress found. This, Congress feared, led to worthless as well as worthwhile cases and to lawyers reaping excessive fees that should have gone to wronged investors.

In place of that practice—a practice wherein the class lawyer selected the class plaintiff—Congress sought to substitute a new model, one that reversed the roles. Under the new model, the court would appoint the lead plaintiff who, in turn, would select and direct class counsel. Congress expected that the lead plaintiff would normally be an institutional investor with a large stake in the outcome. The lead plaintiff would then monitor, manage and control the litigation, making, as is the case in ordinary cases, litigation decisions on resource allocation and settlement, with, of course, the advice of, but not the prerogative of, class counsel.

Under the heading of "Method For Determining The Most Adequate Plaintiff," the Conference Committee stated the perceived problem and its solution in these terms:

> The Conference Committee was also troubled by the plaintiffs' lawyers "race to the courthouse" to be the first to file a securities class action complaint. This race has caused plaintiffs' attorneys to become fleet of foot and sleight of hand. Most often speed has replaced diligence in drafting complaints. The Conference

Committee believes two incentives have driven plaintiffs' lawyers to be the first to file. First, courts traditionally appoint counsel in class action lawsuits on a "first come, first serve" basis. Courts often afford insufficient consideration to the most thoroughly researched, but later filed, complaint. The second incentive involves the court's decision as to who will become lead plaintiff. Generally, the first lawsuit filed also determines the lead plaintiff.

\* \* \* \* \* \*

The current system often works to prevent institutional investors from selecting counsel or serving as lead plaintiff in class actions [footnote omitted]. The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the "most adequate plaintiff."

The Conference Committee believes that increasing the role of institutional investors in class actions will ultimately benefit shareholders and assist courts by improving the quality of representation in securities class actions. Institutional investors are America's largest shareholders, with about $9.5 trillion in assets, accounting for 51% of the equity market. According to one representative of institutional investors: "As the largest shareholders in most companies, we are the ones who have the most to gain from meritorious securities litigation."

\* \* \* \* \* \*

Finally, this lead plaintiff provision solves the dilemma of who will serve as class counsel. Subject to court approval, the most adequate plaintiff retains class counsel. As a result, the Conference Committee expects that the plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff. The Conference Committee does not intend to disturb the court's discre-

tion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

House Conf. Rep. 104-369, 104 Cong., 1st Sess., 33-35 (1995), U.S.Code Cong. & Admin. News, 104 Cong. 1st Sess. 732-34 (1995).

To effect these ends, the PSLRA now requires the plaintiff in the first-filed action to publish a notice advising of the pendency of the action and advising that any member of the proposed class can come forward and move to serve as lead plaintiff. In other words, the first plaintiff to file is no longer the presumptive lead plaintiff. There is no need to file first because any investor can apply for the job of lead plaintiff. Once all timely applications are made, the PSLRA requires the court to appoint as the lead plaintiff the member or a group of members of the purported class that the court determines to be most capable of adequately representing the interests of the class.

To encourage the selection of an institutional investor as the lead, the PSLRA also creates a rebuttable presumption concerning which class member is most capable of adequately representing the interests of class members. The court must apply the rebuttable presumption to the person or group of persons that, (1) "has either filed the complaint or made a motion in response to a notice" of the action, (2) "has the largest financial interest in the relief sought by the class," and (3) "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). The presumption may be rebutted "only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff" (1) "will not fairly and adequately protect the interests of the class" or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

Since 1995 when the PSLRA was approved, there have, in fact, been some instances of large institutional investors advancing themselves and being selected as lead plaintiffs. *E.g., Gluck v. Cellstar Corporation,* 976 F.Supp. 542 (N.D.Tex. 1997) (appointing State of Wisconsin Investment Board). For the most part, however, a different pattern altogether has developed, one that remarkably resembles the old regime. As was true before the PSLRA, in the wake of a substantial drop in any publically-traded stock, dozens of class suits are typically filed. Unlike before, however, the PSLRA requires the plaintiff in the first-filed suit to publish the statutory initial notice to invite lead plaintiff candidates to step forward. Although this notice was expected by Congress to be published once and to encourage uninvolved investors to come forward and to compete for the lead role, the notices in practice extol the lawyer filing suit, and invite the investor to fill out a form and return it to the lawyer. Each lawyer competes to accumulate as many forms as possible in order to amass the largest "group" possible. Not only does the first counsel to file give notice but so do many other lawyers filing suit, not once but over and again, all in an effort to compile the largest portfolio of investor names. The race to the courthouse has been replaced by a race to both the courthouse and thence to the publisher.

The PSLRA did not authorize or contemplate such a process. Instead, it called for notice to affected investors so they could decide whether to seek the role of lead plaintiff on their own. In practice, however, the real purpose and effect of the forms is to steer investors away from seeking the lead role on their own and to steer them toward registering with a lawyer who already has a lead plaintiff candidate. One of the forms used in this case, for example, states in part that the investor has reviewed the complaint and "If necessary, I authorize the filing of a similar complaint on my behalf. * * * I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary." The form

does not specifically state that the investor wishes to take on the responsibility for being the lead plaintiff, nor does it specifically authorize and retain any particular counsel to seek such a responsibility on their behalf. To the extent an investor truly seeks the role of lead, a legitimate question arises whether one law firm (or single set of law firms) could represent all of them without irreconcilable conflicts, given that not every candidate could be advanced and counsel would have to dash the hopes of one or more seeking the job. The forms make no disclosure of this problem. Nor do they include a waiver of any conflict.

This form-submitting process bears a resemblance to the claim-submitting process that traditionally has occurred at the end of class litigation. The only information required to be written in by the investor in the form mentioned was the name of the investor and the number of shares purchased or sold, the price, and the date. The rest is boilerplate. In this connection, one class counsel candidate herein accuses another of disguising its notices so as to cause investors to believe that returning the form is a prerequisite to participation in any ultimate recovery—when it plainly is not under the law. No doubt, many send in the forms thinking they need to in order to participate in any recovery.

When the motions to appoint lead counsel are made, as here, these forms are then bound into numerous thick booklets as alleged documentary support for counsel's motion on behalf of a group of movants, as has been done in this case. Counsel argue that the group as a whole has a large stake in the outcome—therefore, the group should be the presumptive lead plaintiff.

The only thing the investors in any group have in common, however, is the lawyer. They have no link to each other. They are not organized with any group decisionmaking apparatus. They attended no organizing meetings. They have no cohesive identity. They have no name other than one arbitrarily selected by the lawyers. They do not, in all probability, even know they belong to a group or know its name or know how their form is being used. The group name is not on the published notice, nor in the form returned to counsel. The name is invented after the fact by counsel. In the present case, in the process of challenging each other's group, one side herein obtained declarations from several institutions recanting their forms, saying they were misled by opposing counsel. With thousands of forms submitted in heavy boxes to the Court, and with no discovery conducted as to the bona fides of any, the truth is that there is no way to check the accuracy of the forms or the accuracy of the claimed totals. Indeed, the Milberg volumes are accused of including numerous discrepancies, ranging from unsigned forms, to forms refusing to be a lead plaintiff, to trades that could not have occurred as represented (due to Sunday dates, etc.). These defects are only those that appear on the face of the forms without the benefit of discovery.

Counsel invariably insert the word "group" into the title of the ensemble, as in "Network Institutional Group" or the "Network Associates Lead Plaintiff Group." This usage lends an appearance of tying into the statutory wording that the lead plaintiff may be a "person or group of persons," a phrase to be discussed momentarily. Counsel then urge, as here, that the group with the largest aggregate losses should dictate the selection of lead plaintiff. The threshold issue for decision is whether to permit such aggregation.

\* \* \* \* \* \*

In no case has a court actually designated such an aggregation as the lead plaintiff. That would be tantamount, given the hundreds or thousands involved, to letting the class represent itself. And, there is no way such an assembly could control and manage counsel. The decisions have flat-out refused to appoint "large amalgamations of unrelated persons as lead plaintiff." *In re Advanced Tissue Sciences Se-*

*curities Litig.*, 184 F.R.D. 346, 352 (S.D.Cal.1998).

Nonetheless, although the decisions do not always say so directly, the larger group's tally has been influential, and in some cases controlling, in determining which "group" will be allowed to advance a "subgroup" as the lead. *E.g., In re Informix Corp. Securities Litig.*, C–97–1289–SBA (N.D.Cal. Oct. 17, 1997); *In re Read–Rite Corp. Securities Litig.*, C–97–20059 RMW, slip op. 4 (N.D.Cal. May 27, 1997); *City Nominees, Ltd. v. Macromedia*, No. C97–3521 SC (N.D.Cal. Jan.23, 1997).[2] The subgroup is a smaller number of investors, also chosen by the lawyers. For example, in the present case the Milberg motion is on behalf of 1725 (or more, the exact number being too large to ascertain) investors but seeks the appointment of ten investors called "The Network Associates Lead Plaintiff Group." As with the larger mass, the subgroup has no organized decisionmaking apparatus, no coherency, no common ground other than the lawyer. They too are simply disparate, unlinked, and unrelated investors. Although the PSLRA authorizes an investor to seek the lead for itself, it does not authorize investors to seek the lead for someone else. Nonetheless, some courts have acquiesced in allowing the largest group to install a subgroup, reading the phrase "persons or group of persons" to so authorize. Once the subgroup is installed, the larger group is not heard from again.

Not all courts have gone along with aggregation. In one of the first decisions on point, Judge Cedarbaum of the Southern District of New York rejected a group appointment when the group consisted of unrelated investors:

To allow an aggregation of unrelated plaintiffs to serve as lead plaintiffs defeats the purpose of choosing a lead plaintiff. One of the principal legislative purposes of the PSLRA was to prevent lawyer-driven litigation. Appointing lead plaintiff on the basis of financial interest, rather than on a "first come, first serve" basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers. *See* H.R. Conf Rep. No. 104–369, at 31–35 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 730, 730–34. To allow lawyers to designate unrelated plaintiffs as a "group" and aggregate their financial stakes would allow and encourage lawyers to direct the litigation. Congress hoped that the lead plaintiff would seek the lawyers, rather than having the lawyers seek the lead plaintiff. *Id.* at 35.

Counsel have not offered any reason for appointing an aggregation of unrelated institutional and individual investors as lead plaintiffs other than the argument that the language of the statute does not expressly forbid such a result.

*In Re Donnkenny Inc. Securities Litigation*, 171 F.R.D. 156, 157–158 (S.D.N.Y. 1997). Instead, Judge Cedarbaum appointed a single investor. The two most recent decisions in this district have followed Judge Cedarbaum and refused to allow aggregation. *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577 (N.D.Cal. 1999); *In re McKesson HBOC, Inc., Securities Litig.*, slip. op., C99–20743 RMW (N.D.Cal. Oct. 29, 1999). The undersigned agrees with Judge Cedarbaum's approach. After

**2.** The cited cases are only examples. The Court has reviewed many decisions and articles on the problem. Abundant citations, however, would add little. The text of this opinion accurately summarizes the case law. It should be noted that in many of the instances in which the court appointed a subgroup, the court was faced with an unopposed group of plaintiffs or competing groups with no institutional investor stepping forward. *In re Read–Rite Corp. Securities Litig.*, cited in the text, was such an example. *But see In re Oxford Health Plans, Inc., Sec. Litig.*, MDL–1222 (S.D. N.Y. July 15, 1998). *See generally* Stuart M. Grant, *Appointment of Lead Plaintiffs Under the Private Securities Litigation Reform Act, in* Securities Litigation 1998, 547 (Jay Kasner & Bruce Vanyo co-chairs, *Practising Law Institute* 1998).

a review of the statute and its legislative history, the Court is convinced that such aggregation is improper. Because of the currency of the problem, an explanation is in order.

Section 78u–4(a)(3)(A) provides that the early notice to class members must advise that "any member of the purported class may move the court to serve as lead plaintiff." [3] Section 78u–4(a)(3)(B) imposes a ninety-day deadline for consideration of any motion made by the lead plaintiff candidate. It states that the court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." Where consolidation of multiple cases has occurred, the same provision requires the court to "appoint the most adequate plaintiff as lead plaintiff for the consolidated actions . . . ." The court is required to "adopt a presumption that the most adequate plaintiff in any private action . . . is the person or group of persons" that, among other things, 'has the largest financial interest in the relief sought by the class' " and otherwise satisfies the requirements of Rule 23 of the FRCP. (Once again, this is the passage wherein the word "group" appears and the only such passage.) The presumption may be rebutted only upon proof by a member that "the presumptively most adequate plaintiff" will not fairly and adequately protect the interests of the class or is subject to unique defenses. Discovery relating to adequacy may be conducted in certain circumstances.

To be sure, the PSLRA thus contemplates that a "group of persons" may qualify as the lead. The PSLRA, however, equally contemplates that the court will select "the most adequate plaintiff" as the lead. The whole point of the reform was to install a lead plaintiff with substantive decisionmaking ability and authority. For example, a group of mutual funds managed by a single organization might qualify. It would have an internal coherency and would be capable of acting as a unified decisionmaker. A mass of unrelated investors could not do so. Were it otherwise, then a qualified institutional investor with the single largest loss could be trumped by a collage of individual investors with greater aggregate losses but no ability to manage the case. Congress plainly rejected that proposition.

Too, an incoherent group with no decisionmaking apparatus would be far too unwieldy to satisfy Rule 23. In the present case, for example, the competing groups did not even vote on the memberships of the subgroups suggested for reasons of "administration and efficiency." The subgroups were simply hand-picked by counsel and dressed up with names. Such unorganized groups of unrelated investors with nothing in common other than the lawyer and with no clear-cut mechanism for making decisions could not "fairly and adequately" carry out the responsibility to protect the interests of the class.

The Court has tried to trace the origin of the word "group" in the legislative history. The phrase a "person or group of persons" was in the bill as passed by the Senate. (It had not been in the House version.) The language went to the conference and then back to both houses, there approved. The Senate Report repeatedly referred to "the lead plaintiff," "the member of the purported class with the largest financial stake," "the most adequate plaintiff" and "the lead plaintiff's choice of counsel," among other phrases— all couched in the singular tense. Sen. Rep. No. 104–98, 104th Cong., 1st Sess., 11–12 (1995). Not once was any reference made to the possibility of the lead plaintiff being an amalgam of unrelated class members. The Conference Report, even more so, referred in the singular tense to "the lead plaintiff," "the member of the pur-

---

**3.** For discussion of the purpose of the notice, see *Ravens v. Iftikar,* 174 F.R.D. 651 (N.D.Cal. 1997).

ported class with the largest financial stake," "the presumptively most adequate plaintiff," and "the plaintiff"—a total of at least twelve such references, all in the singular, including the heading "Method for Determining the 'Most Adequate Plaintiff.'" *House Conf. Rep. No. 104–369,* 104th Cong., 2d Sess., 33–35 (1995). It seems clear that Congress intended a single, strong lead plaintiff to control counsel and the litigation. No reference whatsoever was made in the reports to multiple, unrelated individuals at the helm.

The SEC has reached the same conclusion. In a memorandum filed by the SEC in *In re Oxford Health Plans, Inc.,* 182 F.R.D. 42 (S.D.N.Y.1998), the SEC stated:

The language and purpose of the Act make clear that Congress believed that the compensation and protection of investors would best be served if only one lead plaintiff, that with the largest financial interest in the litigation, were to be appointed. The Act speaks in terms of a single lead plaintiff being named and lead counsel being chosen by that plaintiff. Although at times courts applying the Act have appointed voluntarily formed groups to serve collectively as lead plaintiff, no case of which we are aware has allowed the appointment of two competing groups of plaintiffs with separate counsel as co-lead plaintiffs.

\. \*     \*     \*     \*     \*     \*

It is not clear whether the Vogel Plaintiffs are contending that the Association would, under these criteria, be an inadequate representative of the class's interests. While we are not aware of any reason the Association would not satisfy the statutory criteria, the Commission takes no position on that issue. But if the Court determines that the Association meets the requirements of the Act for appointment as lead plaintiff, the Court should appoint the Association as sole lead plaintiff.

\*     \*     \*     \*     \*     \*

It is true that the Act uses the plural when it specifies that the lead plaintiff may be "the member or members of the purported plaintiff class" most capable of representing the class, and that the lead plaintiff may be a "person or group of persons." But that is consistent with the view that while there can only be one lead plaintiff, that plaintiff need not be a single person or entity, but rather might be a group of persons who have joined forces. On the other hand, reading the language to allow the appointment of competing movants as co-lead plaintiffs would appear inconsistent with the language in the Act, quoted above, which looks toward appointment of a single lead plaintiff. The language of the Act, taken as a whole, warrants the appointment of only a single lead plaintiff.

In a more recent SEC memorandum filed in *In re Baan Co. Securities Litig.,* 186 F.R.D. 214, 218–35 (D.D.C.1999), the SEC expounded on the meaning of "group of persons" as used in the PSLRA. According to the memorandum, a district court need not accept as lead plaintiff any proffered group of investors. The SEC explained that the "most adequate plaintiff" requirement was intended to place responsibility for managing securities class action litigation in the hands of institutions. Such investors, the memorandum continued, possess the sophistication, expertise and resources to manage securities litigation efficiently. The SEC noted that the PSLRA did not go so far as to require that the lead plaintiff always be an institutional investor. Nevertheless, it concluded that any other group selected as lead plaintiff "should have comparable ability to control the litigation and the lawyers." *Id.* at 224.

Having articulated that prerequisite, the SEC sought to distinguish between "group[s] of persons" that possess the requisite ability to control litigation and groups that do not. The SEC expressed concern at placing in charge of a securities class action lawsuit a group of investors "who were previously unaffiliated, each of whom have suffered modest losses, and

who thus have no demonstrated incentive or ability to work together to control the litigation." *Ibid.* Its memorandum noted that "[t]he problem is made worse if the members have been recruited by counsel ... [S]uch an assemblage will be unable to manage the litigation and control the lawyers. The net result will be that, while the 'group' nominally has a large stake in the litigation, the lawyers will dominate the decisionmaking." *Ibid.* Nor are the management problems incumbent upon large, unaffiliated groups necessarily cured through the nomination of a "steering committee," the SEC opined, given that a smaller group of unaffiliated and uncoordinated investors remain both unaffiliated and uncoordinated. *Id.* at 225.

In a footnote, the memorandum noted that some lawyers had taken advantage of the PSLRA by recruiting individual clients and then packaging them together as a "group." Quoting a report by the SEC Office of General Counsel, the footnote explained, in a passage this case illustrates in vivid hues, that some attorneys had resorted to "phras[ing] [notices to the class under the Act] in a way more likely to attract clients, rather than competition from investors (and other law firms) independently vying to be named lead plaintiff." *Id.* at 224 n. 13, quoting Office of the General Counsel, Securities and Exchange Commission, *Report to the President and the Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995* (Apr.1997). The SEC urged that district courts who select as lead plaintiff a "group of persons" choose only those groups small enough to "effectively manage the litigation and the lawyers." *Id.* at 224.

Another recent amicus brief by the SEC is in accord. In an appeal to the Eleventh Circuit concerning the validity of a class settlement, the SEC noted that a member of a "group" of ten plaintiffs did not know of or approve the settlement in advance, this oversight being yet another vice of the aggregation approach. The SEC stated:

> It is not sufficient for counsel merely to aggregate large numbers of unaffiliated persons into a "group" and, because this assemblage collectively has the largest claimed losses, have it appointed as lead plaintiff. A "group of persons" within the meaning of the Act should, like an institution or single large investor, be able to actively oversee the conduct of the litigation and monitor the effectiveness of counsel. In short, the Act's allowance for a "group of persons" as lead plaintiff must be interpreted by reference to the Act as a whole and to the Act's purpose.

> \*   \*   \*   \*   \*   \*

> To enable the court to assess whether the proposed group is capable of performing the lead plaintiff function, it should provide appropriate information about its members, structure, and intended functioning. Such information should include descriptions of its members, including any pre-existing relationships among them; an explanation of how it was formed and how its members would function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to communicate with one another about the litigation. If the proposed group fails to explain and justify its composition and structure to the court's satisfaction, its motion should be denied or modified as the court sees fit.

Amicus Brief of SEC in *Parnes, et al., v. Digital Lightwave, Inc.,* at 12, 15, No. 99–11293 (11th Cir. Aug. 25, 1999). In response to this Court's invitation to address another issue discussed below, the SEC repeated these same conclusions in an amicus brief filed herein. As the agency charged with enforcement of the legislation, the SEC's construction is entitled to considerable deference. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

For all of the foregoing reasons, the Court would consider a group candidate only if it meets the strict criteria set forth above. In this case, neither proposed group

even comes close. Artificial aggregation of the type here proposed should never be allowed for any purpose, including to serve as lead plaintiff or to sponsor a subgroup as lead plaintiff. Therefore, the Court will attempt to identify the single candidate with the largest financial interest in the litigation and vet that candidate against the requirements of the PSLRA.

### Identifying the Presumptive Lead Plaintiff

The Court requested that the groups tendered be broken down and that investors therein with the largest stakes submit responses to a court-devised questionnaire. The Court also requested that each candidate appear at a hearing on November 4, 1999, to respond to the Court's questions. Before the hearing, the Milberg group sought discovery from the Weiss group. The Court allowed a four-hour deposition of each of the other's main institutional candidate. These were KBC Equity Funds ("KBC") and ING Investment Management ("ING"), both located in Europe. Although the Court was reluctant to grant the discovery, these short depositions have proven illuminating. On November 4, the Court held a hearing on all lead-candidate motions. All candidates appeared except KBC and ING. Each candidate was interviewed by the Court as was its counsel. Limited questioning by other counsel was permitted, which proved useful as well. Altogether eight candidates were considered, including KBC and ING in absentia. The hearing lasted from 4:00 p.m. to 8:00 p.m. As to certain issues that arose, supplemental submissions were allowed to be filed by November 10.

Based on the foregoing, the Court must now proceed to identify "the presumptively most adequate plaintiff." The PSLRA requires as follows:

> Subject to subclause (II), for purposes of clause (i) the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

With respect to which candidate has the largest financial interest in the relief sought, i.e., the potential recovery, the first step is to subtract the number of shares sold by a candidate from those purchased during the class period. The result provides net numbers for comparison among the candidates. At least as a first approximation, the candidate with the most net shares purchased will normally have the largest potential damage recovery. This approach gets into trouble only if the amount of the "fraud premium" varied over the course of the class period. In that case, the problem would be that some transactions resulted in greater losses than others and thus not all transactions were equal. At this stage, however, it is impossible to determine such variations. The best that can be done is to assume a constant fraud premium per share throughout the class period. It really does not matter what size premium is used, for all shares would have been inflated to the same extent. The test simply reduces to the net number of shares bought and sold during the class period.

■ The Weiss firm argues that "ING Investment Management" has the largest stake. There is, really, no such entity. The actual name of the company is ING Insurance Verseiking NV. It is located in the Netherlands. ING Investment Management is merely an unincorporated business unit. It manages a number of separate funds, each fund being the actual owner of the shares. These funds are separate legal entities with their own directors. The funds were the entities that actually bought and sold the Network se-

curities. ING Fund Management is the business unit that by contract provides administrative support to the funds. This candidate is, thus, a group of investment funds (or investors). It would qualify as a "group" within the meaning of the PSLRA. Its membership is small; it pre-exists the lawyers; and it had a pre-existing structure for making decisions.

The Milberg faction argues that "KBC Equity Fund" has the largest stake. KBC Bank & Holding Company, located in Belgium, owns KBC Bank (Belgium) and Kredietbank Luxembourg (also referred to as KB Luxembourg). By contract, KBC Bank Belgium provides administrative services to a series of KBC Funds, such as a "Technology" fund and a "US Small Caps" fund and so on. As with ING, these funds are the actual owners of the Network shares. Once again, they too could be properly treated as a group, for the reasons stated above.

Before the November 4 hearing and following, the Court received many submissions from the two sets of counsel, each declaring its institutional candidate to have the larger financial stake. Virtually all of these numerical submissions have been confusing and laced with errors and unspoken assumptions. The Court has labored over them, trying to reverse engineer the numbers. In the end, however, it is unnecessary to master the accounting gymnastics, for it seems clear that neither KBC or ING could satisfy the requirements of Rule 23 and neither would fairly and adequately protect the interests of the class. In other words, neither can qualify as the presumptive lead plaintiff and, if even they could, they have been proven unfit under Section 78u–4(a)(3)(B)(iii)(II).

With respect to ING, Weiss proposes that a young in-house lawyer at ING Investment Management named Eric Vrij would be the ING point person for this litigation. He graduated from law school three years ago and now works in the legal department. He has no litigation experience. In his deposition, Mr. Vrij admitted that an ING fund director signed off on ING's participation as a lead plaintiff before Vrij even briefed the fund directors on the issues in the case (Vrij Dep. 55–57). When asked whether the ING funds would be willing to provide testimony (a statutory requirement), he testified that it "depends" and that he did not "think the funds are willing to spend a lot of time on this at all" (Dep.58–59, 66, 77). Mr. Vrij suggested that ING also would draw lines in terms of participating in depositions (Dep.59) and producing documents (Dep.65). ING's decision to participate, he said, was subject to change "if the burden would reach a certain level" (Dep.80, 87). To travel to San Francisco for this case would be a burden (Dep.59, 88). In this connection, Mr. Vrij found it inconvenient to travel to San Francisco for the hearing to select a lead plaintiff even though the Court's order dated October 13, 1999, advised all candidates to be present. At his deposition, Mr. Vrij seemed confused regarding the state of this litigation and the importance of choosing a lead plaintiff. When asked whether he understood that the Weiss firm had filed a lead plaintiff motion on ING's behalf, Mr. Vrij responded, "What I know is, on the basis of the forms we have submitted, they must have made some filing to the court" (Dep.89–90). Later Mr. Vrij sent a fax to the Court stating, "The court session on the 4th November is essentially a competition between law firms striving to be appointed Lead Counsel ...." This remark fundamentally misapprehends the role of the lead plaintiff and the purpose of the hearing, which was to choose a lead plaintiff.

Mr. Vrij selected Weiss & Yourman merely because he received its mass-mailed form. He sent it in erroneously thinking it was necessary to do so to participate in any recovery (Dep.16–17). He has no experience in selecting litigation counsel and did not consider any other counsel candidates. He had no prior experience with Weiss & Yourman. He did not know that Weiss & Yourman's co-counsel (Stull, Stull & Brody) was already suing an ING affiliate in a different securities case

(Dep.63). ING has no experience in U.S. litigation or securities litigation (Dep.69, 96). The Court concludes that ING lacks the experience and commitment to this case to represent the class fairly and adequately.

KBC has at least two major negatives. *First*, the record indicates that the two sister banks (the one in Luxembourg and the one in Belgium) are under investigation for criminal fraud violations of the laws in Belgium, that the authorities have conducted "raids" on the Belgium bank as part of its criminal fraud investigation, and that the CEO of KB Luxembourg has already been arrested for tax evasion, fraud, money laundering, conspiracy and consorting with criminal elements (Lema Dep. 69–71, 75). Even if this evidence were excluded at trial in this case (and it probably would be), the Court is unwilling to install an enterprise under such a cloud in a position of trust and confidence. KBC is otherwise preoccupied with its own legal problems.

*Second*, the lion's share of KBC's acquisition of Network securities was not in open-market transactions but via a merger. Two KBC funds owned shares of Dr. Solomon Group PLC ("Dr.Solomon"), which Network acquired during the class period. The exchange rate of shares would normally have been negotiated after a period of due diligence in which the leadership of Dr. Solomon would normally have had access to information not generally known to the investing public. The Milberg lawyers make this very point in challenging Candidate Julian Yates ("Yates") (sponsored by the Weiss firm), who acquired his Network stock "as the result of an acquisition rather than through an open market purchase" (Br.5).[4] The Milberg complaint itself, moreover, prominently portrays Network's accounting for the Dr. Solomon acquisition as a centerpiece of the fraud. The SEC-induced adjustments announced in April 1999 apparently focused on improper accounting treatment of Dr. Solomon's in process R & D (Compl., ¶¶ 29–53). It is entirely plausible that Network's supposed fraudulent bookkeeping allowed it to pay more for Dr. Solomon. All modern securities cases are premised on the fraud-on-the-market presumption adopted by a plurality in *Basic, Inc., v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), a presumption that will not be applied when the efficient-market assumption is inapplicable. The theory is that investors rely on the integrity of the market and its ability to reflect in the stock price the effect of all publicly known information. Non-public

---

4. The Milberg brief states (Br.5):

Here, unlike open market purchasers, Yates acquired his stock as the result of a negotiated transaction, Networks' acquisition of Trusted Information Systems, Inc. ("TIS"). That acquisition was the result of extended negotiations and confidential information provided by Network's officers. [Footnote omitted.] Such facts would clearly render Yates' claim atypical, subject to unique defenses and would distract from the claims of the class. *See Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 169 (D.Mass.1989) (plaintiff not typical of class where purchase resulted from unique access and communications with corporate officers). Yates' deposition will demonstrate that he is subject to unique defenses and is not an appropriate representative for open market purchases.

At the hearing, KBC's own argument against Candidate Yates—based on merger negotiations and individual issues—was turned against KBC, given its own acquisition of most of its Network shares via merger. KBC's counsel then reversed field. After the November 4 hearing, KBC's counsel submitted argument that an exchange of shares which occurs as a result of merger satisfies the purchase or sale requirement of Rule 10b–5. No doubt that is so, but that is not the issue. The question is, rather, whether a class member encumbered with such unique issues as KBC should be allowed to serve as the lead plaintiff under the PSLRA. On this point, KBC's counsel cites pre-PSLRA decisions, none of which are directly on point. One expressly recognized a "merger class" in addition to a "note class." *In re First Republic Bank Securities Litig.*, 1989 WL 108795, 1989 U.S. DIST. LEXIS 11139, *35–39 (N.D.Tex.1989). Given the importance now assigned by the PSLRA to the role of lead plaintiff, the Court concludes KBC counsel was correct the first time.

information, however, is not reflected in the market price. KBC, unfortunately, would be encumbered with the unique question whether it acquired its Network shares on better terms than the investing public and not fully in reliance on the market price. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992).[5]

Finally, both ING and KBC are foreign organizations. They are distant. They were the only candidates not to attend the lead plaintiff hearing even though the Court requested all candidates to do so by order dated October 13, 1999. The distances involved and some differences in business culture would impede their ability to manage and to control American lawyers conducting litigation in California. At trial, the representative plaintiff would normally testify and attend. In a long trial, it would be obviously difficult for ING or KBC to attend in its entirety. The Court certainly does not say that a foreign investor could never qualify. But these factors, when added to the others set forth above, reinforce the Court's conclusion that neither KBC nor ING can fairly and adequately represent the class.

■ The candidate with the next greatest loss is the Board of Pensions And Retirement of the City of Philadelphia (Pennsylvania) ("Board"). During the class period, it purchased more than three million dollars worth of Network Securities (and sold none until after the class period), all open-market transactions. The Board claims to have a track record of successful prosecution of securities suits on behalf of class members. A representative of the Board appeared at the hearing.

One serious question about the Board's candidacy arises from the following PSLRA restriction:

> Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

15 U.S.C. § 78u–4(a)(3)(B)(vi).

The Conference Report, however, made clear that an institutional investor like the Board may be granted special leave to serve beyond the limit:

> The Conference Report seeks to restrict professional plaintiffs from serving as lead plaintiff by limiting a person from serving in that capacity more than five times in three years. Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict. As a result, the Conference Committee grants courts discretion to avoid the unintended consequence of disqualifying institutional investors from serving more than five times in three years. The Conference Committee does not intend for this provision to operate at cross purposes with the "most adequate plaintiff" provision.

H.R. Conf. Rep. No. 104–369, at 35. As the Ninth Circuit recently observed, apart from the statute itself, the Conference Report for the PSLRA represents "the most reliable evidence of congressional intent." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir.1999). The Court is inclined to permit the Board to exceed the limit, as the PSLRA authorizes the Court to do.

A second negative is that the Board did not seek competitive bids from prospective counsel. *In re Cendant Corp. Litig.*, 182 F.R.D. 144, 150 (D.N.J.1998); *Wenderhold v. Cylink Corp.*, 188 F.R.D. 577 (N.D.Cal. 1999). In fairness, however, the Board had allied itself with the NALPG. It may have felt there was no point in seeking

---

5. As previously discussed, the same problem arises for Candidate Yates who acquired his stock via negotiated mergers. In addition, Mr. Yates was the CEO of a firm sued for fraud. He settled the case for one million dollars. He, too, was sued personally in the same case. He, too, paid several hundred thousand dollars.

bids, especially since the Board had used various counsel in the past and felt Barrack, its own firm in the alliance, had shown itself worthy in the past. Because the Board did not have a clear-cut opportunity to select counsel, the Court will require the Board, if it accepts the role of lead plaintiff, to interview multiple firms and to solicit competitive fee arrangements, as set forth below.

Accordingly, the Court finds that the Board is the presumptive lead plaintiff and finds that the presumption has not been rebutted. Subject to the Board's execution of the undertaking described hereafter, the Board of Pensions And Retirement of the City of Philadelphia will be appointed as the lead plaintiff.[6]

### The Question of a Co-lead Plaintiff

The Court is impressed favorably with a number of individual investors, such as Robert Vatuone and Raymond Moore, to name only two, several of whom traveled great distances (admittedly at counsel's expense) to attend the hearing. An argument could be made that an investor who lost a large share of his or her net worth has a larger financial interest, percentage-wise, than an investor with larger absolute dollars lost but for whom the loss is only a small fraction of its overall portfolio. It is tempting to add a single individual investor to co-lead the class. An individual would provide a different perspective and would temper the management prerogative of an institutional investor. Too, an individual investor would help tell the story to the jury in human terms (although such investors need not be lead plaintiffs to be presented at trial). The SEC, however, has urged that such co-leads not be appointed. The SEC urges that the fiduciary responsibility not be diluted. The Court will, for now, honor that view and appoint the Board as the sole lead plaintiff.

### Cross Attacks on Counsel And Their Notice Process

Relentlessly, the Milberg and Weiss firms have traded inflammatory charges of fraud, incompetence, and solicitation—even allegations of criminal conduct. Each is unfit, the other says, to represent a class in this case. The Court has carefully read all the submissions and will not burden an already lengthy memorandum except to address these points.

First, the Milberg alliance contends that the Weiss firm committed criminal violations of the securities laws by reimbursing broker/dealers for the nominal costs to circulate a Weiss letter to Network investors known to them.[7] Judge Armstrong, the undersigned's predecessor in this case, agreed with half of Milberg's argument, finding that acceptance by broker/dealers of reimbursement for mailing costs violated Section 78o(c)(8). Judge Armstrong held, however, that the Weiss firm did not violate any law in making the reimbursements. The Milberg firm moved for reconsideration, claiming it was criminal aiding and abetting to make such payments to the broker/dealer. 18 U.S.C. § 2. The undersigned then asked the SEC for its views. In its excellent amicus submission, the SEC concludes that Section 78o(c)(8) prohibits payment for the value of referring potential clients but not for merely reimbursing for reasonable expenses. The SEC notes that "the effect of mailings could be to encourage additional investors to come forward, negotiate with and retain counsel [of their own] and move to be lead plaintiff, thereby enhancing competition for lead plaintiff and lead counsel" (Br.31). The Court agrees. Like the SEC, however, the Court does not bless the particular mailings used in this case, as explained below. Because of the

6. In *McKesson,* Judge Whyte recently refused to allow the Florida State Board of Administration to serve yet again, but another acceptable institutional candidate was readily available. Here, there is no alternative acceptable institutional candidate.

7. This was in addition to publishing in business periodicals.

importance of the issue, the Commission's amicus brief is appended to this opinion.

*Second,* the Weiss firm reminds us that the Milberg firm was singled out by Congress as emblematic of the old regime (Br.2, 10):

> A direct target of Congress, singled out for much of the criticism of lawyers who manipulate the securities laws to serve their own interest, was Milberg Weiss Bershad Hynes & Lerach ("Milberg"), whose name partner, William Lerach, known as the "King of Strike Suits," had boasted, "I have the greatest practice in the world because I have no clients. I bring the case. I hire the plaintiff. I do not have some client telling me what to do. I decide what to do."

The Court rejects this argument. It is true that Congress singled out the Milberg firm to illustrate what was wrong with the old regime. But the PSLRA was not a bill of attainder. The Milberg firm has as much right as anyone else to seek the role of class counsel under the PSLRA.

■ *Third,* the Weiss firm takes offense at the Milberg firm having tested the bona fides of the Weiss firm's investor forms (Br.4, 11), claiming these attempts interfered with its "clients," violated ethical rules and constituted "discovery" forbidden by Judge Armstrong's order. The Court disagrees. The Weiss forms were not engagements or retention letters and did not come close to establishing attorney-client relationships. Accordingly, there was no ethical bar to calling the investors to check the bona fides of the form. Many of them, in fact, recanted and sent in declarations (via the Milberg firm) explaining how they had been misled by the form. This self-help was not "discovery" within the meaning of the PSLRA.[8]

■ Finally, and of importance, the Court finds the initial notices published by all parties to have been imperfect. While arguably the published notices literally covered the statutory requirements, the notices were expanded into puff pieces steering investors toward registering with counsel and steering them away from independently seeking the role of lead plaintiff, as the PSLRA intended. As for the forms, they looked too much like claim forms and the recipients could easily have thought that they needed to sign up to participate at all. In the future, all such notices should (i) make clear that investors may apply for the role of lead plaintiff through their own counsel and need not necessarily apply through counsel publishing the notice and (ii) make clear that filling out a form or contacting counsel at the initial stage is not a prerequisite to participation in any class recovery.

## Duties of Lead Plaintiff

■ The PSLRA seeks to place the lead plaintiff in charge of conduct of the litigation on behalf of the class. The lead plaintiff owes a fiduciary duty to all members of the proposed class to provide fair and adequate representation and actively to work with class counsel to obtain the largest recovery for the proposed class consistent with good faith and meritorious advocacy. In this case, the lead plaintiff shall take affirmative steps to keep itself fully informed at all times on the progress and status of the case, the strengths and weaknesses of the case, the prospects for settlement, and the resources invested in the suit or proposed to be invested. With respect to each major litigation event, such as important motions, settlement discussions, trial and trial preparation, the lead plaintiff shall actively inform itself in advance and shall have the authority and responsibility to direct counsel, after, of course, receiving the advice of counsel. To minimize reduction from recovery for attorneys' fees, the lead plaintiff shall consult with counsel in advance to determine whether major tasks proposed by counsel are likely to add more value to the case than would be incurred in time and ex-

---

**8.** The Court agrees, however, that Milberg's heavy-handed references to criminal penalties in its letter to broker/dealers, showing copies forwarded to the SEC, appear to have been a form of intimidation to prevent broker/dealers from cooperating with the Weiss firm.

pense. In this connection, the lead plaintiff shall review monthly time and expense records prepared by class counsel. The lead plaintiff shall meet in person with counsel at least quarterly to review the progress and status of the case, shall attend all major hearings and shall attend all sessions of the trial, at a minimum, where the jury is present. Reasonable travel, telephone and business expenses incurred as a result of the lead plaintiff duties, if detailed and itemized, may be reimbursed as expenses from any recovery. The lead plaintiff shall recommend class counsel after completing the steps set forth below. To carry out its responsibilities, the lead plaintiff shall identify a single officer or internal counsel with experience in managing litigation to be primarily responsible for carrying out the duties set forth herein.

### Selection of Counsel to Represent the Class

Section 78u–4(a)(3)(v) provides:

The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

█ Subject to this Court's approval, the Board proposes the firm of Barrack, Rodos & Bacine, including one of its members, Sheldon L. Albert, Esq., to represent it in this action. This firm has an office in San Diego and its main office in Philadelphia. The firm is experienced in securities class actions. Mr. Albert appeared at the hearing and set forth the experience and track record of his law firm. The firm and Mr. Albert have the requisite experience.

The *Digital Lightwave* imbroglio involving the Barrack firm is a concern, however. The Board did not investigate this matter prior to its recommendation. The court-approved settlement in that case is now being challenged on appeal. Class counsel (the Barrack firm and two others) failed to obtain lead plaintiff approval of the settlement in advance from one of ten lead plaintiffs. *Ari Parnes v. Digital Lightwave, Inc.*, Action No. 98–152–CIV–

T–24E (M.D.Fla.). The SEC's brief on appeal states in part "the lead plaintiff group in this case did not and was not allowed to perform its plaintiff role" because at least one of the members of the group "was not even apprised that he had been named as a group member until well after a settlement in the case was agreed to and submitted to the court for approval" (SEC Br. at 3). At the November 4 hearing, Mr. Albert of the Barrack firm gave a plausible explanation for the failure to communicate with that client. The SEC points out that the root of the problem lay in the district court being erroneously led to appoint as lead plaintiff a group (or subgroup) of ten investors with no coherency for decisionmaking. As a result, when the time came for the most important decision of all—the terms of settlement—they were not presented to or approved by all lead plaintiffs. It also appears that the multiplicity of law firms for the plaintiff class contributed to the snafu. By contrast, in the present case, no such amorphous group will be appointed. One lead will be appointed. Nor will there be a multiplicity of law firms. One firm shall serve.

The lead plaintiff owes a fiduciary duty to obtain the highest quality representation at the lowest price. A submission by Professor Joseph Grundfest of the Stanford Law School in the *McKesson* case demonstrates that competitive bidding for the lead counsel role tends to reduce substantially the amount of fees awarded and tends to increase the amount of recovery to the class. Declaration of Joseph Grundfest Regarding Procedures Employed in the Selection of Lead Plaintiff and Lead Counsel Pursuant to the Private Securities Litigation Reform Act of 1995, dated Oct. 7, 1999, *In re McKesson HBOC Securities Litig.*, Action No. 99–20743 RMW (N.D.Cal.). Because the Board lumped itself in the NALPG confederation, it did not have a clear opportunity to conduct such competitive bidding.

Accordingly, the Board must re-open its consideration of counsel; promptly publicize a request for written proposals from counsel; evaluate the proposals; and interview candidates as appropriate—all to obtain the highest quality representation at the lowest price. The Board must then recommend a single law firm and provide under seal to the Court a full description of the Board's selection process, its conclusion, and its reasons. All of the proposals received should also be submitted under seal to the Court by the Board. The Board may still, after full consideration of all candidates, recommend the Barrack firm, but it should do so only after an honest effort to select the highest quality counsel at the most efficient price. The Board should also identify the single law firm which would be its second choice and should state its reasons, all under seal. The Board shall make its sealed recommendations to the Court by December 17, 1999.

Each law firm proposal shall at least include (i) the firm's experience in securities class actions and, by case as practicable, its track record in results achieved (in terms of net dollars to the class); (ii) the securities and trial experience of the proposed individual to be lead counsel, the second chair and a commitment that the lead or the second chair shall conduct all important depositions, court hearings and settlement negotiations, and that the lead shall conduct the trial; (iii) a complete disclosure of any conflicts and contributions made to Board or City officials within the last three years; (iv) two fee proposals, one based on percentage of recovery and the other based on hourly rates (lodestar method). Joint proposals by two or more law firms will not be approved. If a firm with a higher fee proposal is recommended, a convincing reason must be given. The Board should make whatever additional inquiries it believes appropriate to select the best counsel.

Through an officer with knowledge, the Board must also certify under oath that the selection in no way directly or indirectly has been influenced by campaign contributions and must (if the Barrack firm is recommended again) address and explain the suggestions in the articles provided by the Weiss firm that the Board's choice of counsel has been influenced by campaign contributions. See Declaration of Elizabeth Lin, filed Nov. 10, 1999, Exhs. F and G.

Once selected and approved, (i) class counsel shall regularly inform the Board of the progress of the case and shall present all major litigation decisions to the Board for its decision in advance and in a timely manner; (ii) the firm shall log its time on a daily basis, tracking its activities by timekeeper, by individual task, and by quarter-hour increments; and (iii) duplication of effort within the firm shall be prohibited.

To qualify as the lead plaintiff, an authorized officer of the Board must file with the Court by November 23, 1999, a statement under oath that it has read this order and will carry out the obligations of the lead plaintiff, as defined herein, including the process for selecting counsel.

## DENIAL OF TRANSFER TO SAN JOSE DIVISION.

The motion to transfer this case to the San Jose Division by Mr. Vatuone is DENIED.

## CONCLUSION

1. The Board of Pensions And Retirement of the City of Philadelphia is appointed lead plaintiff, subject to filing with the Court a statement under oath by its authorized officer that the Board has read this order and will carry out the obligations of the lead plaintiff as defined herein, including the process for selecting class counsel. This statement must

be filed no later than December 3, 1999.

2. The Court will await selection of class counsel until it receives the recommendations and material from the Board described above.

3. The motion to transfer this case to the San Jose Division is DENIED.

**IT IS SO ORDERED.**[9]

**APPENDIX**

*Memorandum of the Securities and Exchange Commission, Amicus Curiae*

In Re Network Associates, Inc. Securities Litigation, No. C99–01729 WHA, U.S. District Court, Northern District of California

Frank W. Knisley, et. al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Network Associates, Inc., et al., Defendants.

*TABLE OF CONTENTS*

PAGE

INTRODUCTION AND SUMMARY OF THE COMMISSION'S POSITION . . . . . . . . . . . . . .1

THE STATUTORY PROVISION AT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    THE LANGUAGE, PURPOSE, AND HISTORY OF 15 U.S.C 78o(c)(8) SHOW THAT THE "REMUNERATION" PROHIBITED BY THAT PROVISION IS PAYMENT FOR THE VALUE OF REFERRING POTENTIAL CLIENTS, NOT REIMBURSEMENT OF REASONABLE EXPENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
    A. A Well–Established Meaning of Remuneration Is Payment for the Value of a Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    B. Other Language of the Reform Act, the Act's Purposes, and Its History Show That in the Context of 15 U.S.C. 78o(c)(8), Remuneration Means a Referral Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
    C. NALPG's Policy Arguments Are Unpersuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

*TABLE OF AUTHORITIES*

PAGE

*CASES:*
In re Advanced Tissue Sciences Sec. Litig., 184 F.R.D. 346 (S.D.Cal.1998) . . . . . . . . . . . .29

Almendarez–Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

American Airlines, Inc. v. United States, 40 Fed. Cl. 712 (1998) . . . . . . . . . . . . . . . . . . . . . . .12

Anchor Coal Co. v. Public Service Commission, 123 W.Va. 439, 15 S.E.2d 406 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

---

9. This order differs slightly from the November 12 order in that (i) it modifies the order's characterization of the SEC brief in the *Digital Lightwave* case and (ii) extends the time within which the Board may make its submissions.

*PAGE*

Anglo Cal Nat Bank of San Francisco v. Lazard, 106 F.2d 693 (9th Cir.1939) . . . . . . . . . . . . 9

In re Baan Company Sec. Litig., 186 F.R.D. 214 (D.D.C.1999) . . . . . . . . . . . . . . . . . . . . . . 29,30

In re Bargain Busters, Inc., 130 Vt. 112, 287 A.2d 554 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Beets v. Johnson, 180 F.3d 190 (5th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Beets v. State, 767 S.W.2d 711 (Tex.Crim.App.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bell v. Health–Mor, Inc., 549 F.2d 342 (5th Cir.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Bennett v. United States, 399 F.2d 740 (9th Cir.1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bloomgarden v. Coyer, 479 F.2d 201 (D.C.Cir.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,13

Buss v. Unemployment Compensation Bd. of Review, 487 Pa. 610, 410 A.2d 779 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Central Illinois Public Service Co. v. United States, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Charles River Bridge v. Warren Bridge, 36 U.S. 420, 11 Pet. 420, 9 L.Ed. 773 (1837) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Chill v. Green Tree Financial Corp., 181 F.R.D. 398 (D.Minn.1998) . . . . . . . . . . . . . . . . . . . . 29

In re Donnkenny Inc. Sec. Litig., 171 F.R.D. 156 (S.D.N.Y.1997) . . . . . . . . . . . . . . . . . . . . . . 29

Dunn v. CFTC, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997) . . . . . . . . . . . . . . . . . . . . 7

E & B Marketing Enterprises, Inc. v. Ryan, 209 Ill.App.3d 626, 154 Ill.Dec. 339, 568 N.E.2d 339 (1 Dist.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Golon v. Ohio Savings Bank, 1999 WL 184402 (N.D.Ill. Mar.29, 1999) . . . . . . . . . . . . . . . . . . 16

Green v. Bock Laundry Machine Co., 490 U.S. 504, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Guernsey v. Rich Plan of the Midwest, 408 F.Supp. 582 (N.D.Ind.1976) . . . . . . . . . . . . . . . . . 14

Hatfield v. Richardson, 380 F.Supp. 1048 (D.Kan.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

John Hancock Mutual Life Ins. Co. v. Harris Trust & Savings Bank, 510 U.S. 86, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Kirby v. Indiana Employment Security Board, 158 Ind.App. 643, 304 N.E.2d 225 (3 Dist.1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

LaBelle v. State Employees Retirement System, 265 Ill.App.3d 733, 202 Ill.Dec. 766, 638 N.E.2d 412 (2 Dist.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Lake Shore & M.S. Ry. Co. v. Prentice, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Ludington Service Corp. v. Acting Comm'r of Ins., 444 Mich. 481, 511 N.W.2d 661 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*PAGE*

Manning v. Princeton Consumer Discount Co., 397 F.Supp. 504 (E.D.Pa.1975) . . . . . . . . . . . . 14

Martelli v. R.A. Chambers & Assocs., 99 Or.App. 524, 783 P.2d 31 (1989) . . . . . . . . . . . . . . . . 8

Metropolitan Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re Milestone Scientific Sec. Litig., 183 F.R.D. 404 (D.N.J.1998) . . . . . . . . . . . . . . . . . . . . . . 29

In re Milestone Scientific Sec. Litig., 187 F.R.D. 165 (D.N.J.1999) . . . . . . . . . . . . . . . . . . . . . . 31

Mitchell v. Complete Mgmt., Inc., 1999 WL 728678 (S.D.N.Y. Sept.17, 1999) . . . . . . . . . . . . 29

Moskal v. United States, 498 U.S. 103, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) . . . . . . . . . . . . 6

Muscarello v. United States, 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

In re Nice Systems Sec. Litig., 188 F.R.D. 206, 1999 WL 551357 (D.N.J. June 10, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In the Matter of Noss, 133 A.D.2d 510, 519 N.Y.S.2d 431 (3 Dept.1987) . . . . . . . . . . . . . . . . . 7

Overseas Development Disc Corp. v. Sangamo Constr. Co., 840 F.2d 1319 (7th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re Oxford Health Plans Sec. Litig., 182 F.R.D. 42 (S.D.N.Y.1998) . . . . . . . . . . . . . . . . . . . . . 29

Palmer v. Breyfogle, 217 Kan. 128, 535 P.2d 955 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Panos v. Island Gem Enter., Ltd., 880 F.Supp. 169 (S.D.N.Y.1995) . . . . . . . . . . . . . . . . . . . . . 13

In re Party City Sec. Litig., 189 F.R.D. 91, 1999 WL 688195 (D.N.J. Aug.6, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Patterson v. Shumate, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) . . . . . . . . . . . . . 6

People v. Palma, 40 Cal.App.4th 1559, 48 Cal.Rptr.2d 334 (2 Dist.1995) . . . . . . . . . . . . . . . . 15

Petroleum Resource Dev. Corp. v. State, 585 P.2d 346 (Okla.1978) . . . . . . . . . . . . . . . . . . . . . 11

Polk County v. Peters, 800 F.Supp. 1451 (E.D.Tex.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

PPG Indus., Inc. v. NLRB, 671 F.2d 817 (4th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Price Fire & Water Proofing Co. v. United States, 261 U.S. 179, 43 S.Ct. 299, 67 L.Ed. 602 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Red Ball Motor Freight, Inc. v. Shannon, 377 U.S. 311, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) . . . . . . . . . . . . 6

Moses v. Citicorp Mortgage, Inc., 982 F.Supp. 897 (E.D.N.Y.1997) . . . . . . . . . . . . . . . . . . . . . 16

Seiple v. Prudential Ins. Co., 1994 WL 702931 (E.D.Pa. Dec.13, 1994) . . . . . . . . . . . . . . . . . . 12

PAGE

Sherleigh Assocs. L.L.C. v. Windmere–Durable Holdings, Inc., 184 F.R.D. 688 (S.D.Fla.1999) ............................................................. 26,29

Sirianni v. SEC, 677 F.2d 1284 (9th Cir.1982)......................................... 14

Smith v. Johnston, 73 Ill.App.3d 601, 29 Ill.Dec. 409, 391 N.E.2d 1092 (2 Dist.1979) ................................................................. 15

State ex rel. Murphy v. Welch & Brown, 187 Okla. 470, 103 P.2d 533 (1940)............. 7

Switzenbaum v. Orbital Sciences Corp., 187 F.R.D. 246 (E.D.Va.1999) .................... 29

Takeda v. Turbodyne Technologies, Inc., 67 F.Supp.2d 1129 (C.D.Cal. 1999)............. 29

In re Telxon Corp. Sec. Litig., 67 F.Supp.2d 803 (N.D.Ohio 1999) ................... 15,16,29

Tonti v. Petropoulous, 656 F.2d 212 (6th Cir.1981) ..................................... 12

Trotter v. Nelson, 684 N.E.2d 1150 (Ind.1997) ....................................... 9,16

United States v. Covarrubias, 179 F.3d 1219 (9th Cir.1999) .............................. 9

United States v. Duz–Mor Diagnostic Laboratory, Inc., 650 F.2d 223 (9th Cir.1981) ................................................................. 9

United States v. Greber, 760 F.2d 68 (3d Cir.1985) ..................................... 8

United States v. Kats, 871 F.2d 105 (9th Cir.1989) .................................... 14

United States v. Marbella, 73 F.3d 1508 (9th Cir.1996)................................. 14

United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ............................................... 11

United States v. Starks, 157 F.3d 833 (11th Cir.1998)................................. 14

United States v. Universal Trade and Indus., Inc., 695 F.2d 1151 (9th Cir.1983) ................................................................. 9

United States v. Wood, 943 F.2d 1048 (9th Cir.1991) ................................. 10

Upton v. Trinidad Petroleum Corp., 652 F.2d 424 (5th Cir.1981) .................... 10,11

In re Victor Technologies Sec. Litig., 792 F.2d 862 (9th Cir.1986) ...................... 24

Wenderhold v. Cylink Corp., 188 F.R.D. 577, 1999 WL 706027 (N.D.Cal. Sept.3, 1999) ................................................................. 29

Worcester Telegram Publishing Co. v. Director of Div. of Employment Security, 347 Mass. 505, 198 N.E.2d 892 (1964) ..................................... 7

Yang v. State of California, 183 F.3d 953 (9th Cir.1999) ............................... 7

Yousefi v. Lockheed Martin Corp., 70 F.Supp.2d 1061 (C.D.Cal. 1999) .................. 29

STATUTES AND RULES:

Securities Act of 1933, 15 U.S.C. 77a, et seq.:

Section 20, 15 U.S.C. 77t(f) ................................................... 5

Securities and Exchange Act of 1934, 15 U.S.C. 78a et seq.:

Section 15(c)(8), 15 U.S.C. 78o(c)(8) ........................................ 1,2,3,
passim
Section 21(d)(4), 15 U.S.C. 78u(d)(4)........................................... 5
Section 21D(a), 15 U.S.C. 78u–4(a) ........................................ 2,3
Section 21D(a)(2)(A), 15 U.S.C. 78u–4(a)(2)(A) ............................. 15
Section 21D(a)(3)(A), 15 U.S.C. 78u–4(a)(3)(A) ........................... 5,30
Section 21D(a)(3)(B)(iii), 15 U.S.C. 78u–4(a)(3)(B)(iii) ...................2,16,28
Section 21D(a)(3)(B)(v), 15 U.S.C. 78u–4(a)(3)(B)(v) ...................... 2,30
Section 21D(a)(3)(B)(vi), 15 U.S.C. 78u–4(a)(3)(B)(vi) ....................... 15
Section 21D(a)(4), 15 U.S.C. 78u–4(a)(4) .................................. 15,25

Public Utility Holding Company Act of 1935:

Section 7(d)(4), 15 U.S.C. 79g(d)(4)......................................... 25
Section 10(b)(2), 15 U.S.C. 79j(b)(2) ....................................... 25

Investment Company Act of 1940:

Section 17(e)(2), 15 U.S.C. 80a–17(e)(2) .................................... 25
Section 57(k)(2), 15 U.S.C. 80a–56(k)(2) .................................... 25

Rule 14a–2(a)(1)(i), 17 C.F.R. 240.14a–2(a)(1)(i) (1994) ...................... 11

Federal Rule of Civil Procedure ........................................... 4,29

LEGISLATIVE HISTORY:

Joint Explanatory Statement of the Committee of Conference, Conference
   Report on Securities Litigation Reform, H.R. Conf. Rep. No. 104 (Nov. 28,
   1995) .................................................................. 2,18

Report on the Private Securities Litigation Reform Act of 1995, S.Rep. No.
   104 (June 19, 1995) .................................................. 19,22

Report on the Common Sense Legal Reform Act of 1995, H.R.Rep. No. 104
   (Feb. 24, 1995) ......................................................... 18

141 Cong. Rec. H2755 (Mar. 7, 1995) ......................................... 20
141 Cong. Rec. S8892 (June 22, 1995) ........................................ 20
141 Cong. Rec. S8912 (June 22, 1995) ......................................... 9
141 Cong. Rec. S8966 (June 23, 1995) ........................................ 21
141 Cong. Rec. S9040 (June 26, 1995) ........................................ 20
141 Cong. Rec. S9072 (June 26, 1995) ......................................... 9
141 Cong. Rec. S9074 (June 26, 1995) ........................................ 20
141 Cong. Rec. S9093 (June 26, 1995) ........................................ 21
141 Cong. Rec. S9172 (June 27, 1995) ........................................ 21
141 Cong. Rec. S9173 (June 27, 1995) ........................................ 20
141 Cong. Rec. S9208 (June 28, 1995) ........................................ 21
141 Cong. Rec. S9209 (June 28, 1995) ...................................... 20,21
141 Cong. Rec. S9212 (June 28, 1995) ........................................ 20
141 Cong. Rec. S17934  (Dec. 5, 1995)........................................ 20
141 Cong. Rec. S17944  (Dec. 5, 1995)........................................ 21
141 Cong. Rec. S17969  (Dec. 5, 1995)........................................ 19
141 Cong. Rec. S17974  (Dec. 5, 1995)........................................ 21
141 Cong. Rec. S17986  (Dec. 5, 1995)........................................ 22
141 Cong. Rec. S17993  (Dec. 5.1995) ........................................ 20
141 Cong. Rec. S17995  (Dec. 5.1995) ........................................ 21
141 Cong. Rec. S19056  (Dec. 21, 1995)....................................... 21

*PAGE*

Securities Investors Legal Rights: Hearing Before the Subcomm. on Communications and Finance of the House Comm. on Energy and Commerce, 102nd Cong., 1st Sess. (Nov. 21, 1991) .......................................... 17

Securities Litigation Reform: Hearings Before the Subcomm. on Telecommunications and Finance of the House Committee on Energy and Commerce, 103rd Cong., 2nd Sess. (July 22 and Aug. 10, 1994) ................................. 22

Securities Litigation Reform Proposals: Hearings Before the Subcomm. on Securities of the Senate Committee on Banking, Housing, and Urban Affairs, 104th Cong., 1st Sess, (Mar. 2, 22, and Apr. 6, 1995) ...................... 18,22

S. 3181 (Aug. 12, 1992) ....................................................... 17
S.1976 (Mar. 24, 1994)......................................................... 17
S. 240 (Jan. 18, 1995).......................................................... 17,18
S. 667 (Apr. 4, 1995) .......................................................... 18

H.R. 5828 (Aug. 11, 1992)...................................................... 17
H.R. 417 (Jan. 5, 1993) ........................................................ 17
H.R. 10 (Jan. 4, 1995) ......................................................... 18
H.R. 555 (Jan. 18, 1995) ....................................................... 18
H.R. 675 (Jan. 25, 1995) ....................................................... 18
H.R. 681 (Jan. 25, 1995) ....................................................... 18
H.R. 1058 (Feb. 27, 1995) ...................................................... 18

MISCELLANEOUS:

The American Heritage Dictionary of the English Language (3d ed.1996) ................. 8

Barron's Dictionary of Business Terms (2d ed.1994).................................... 9

Black's Law Dictionary (6th ed.1990)........................................... 11

Funk & Wagnalls New International Dictionary of the English Language (Comprehensive ed.1997) ....................................................... 8

Office of the General Counsel, SEC, Report to the President and the Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995 ............................................. 26,31

Webster's Third New International Dictionary of the English Language (Unabridged ed.1993) ......................................................... 8,11

## MEMORANDUM OF THE SECURITIES AND EXCHANGE COMMISSION, AMICUS CURIAE

### INTRODUCTION AND SUMMARY OF THE COMMISSION'S POSITION

Pursuant to the Court's order dated October 7, 1999, the Securities and Exchange Commission respectfully submits this memorandum, as *amicus curiae*, to address, as requested by the Court, "whether it is a violation of 15 U.S.C. § 78o(c)(8) for a broker/dealer to assist an attorney in establishing communication with potential clients by (i) supplying to the attorney mailing labels for its investors in securities involved in a potential class action and accepting from the attorney reimbursement for the cost of labels; or (ii) mailing directly to such investors a letter with the attorney's notice of the suit inviting investors to communicate with the attorney and accepting from the attorney reimbursement for the labels and mailing costs in doing so." This provision was enacted as part of the Private Securities Litigation

Reform Act of 1995 ("Reform Act" or "Act").

The Commission, the agency principally responsible for the administration and enforcement of the federal securities laws, has long expressed the view that legitimate private actions under these laws serve an important role. Such actions work to compensate investors who have been harmed by securities law violations and, as the Supreme Court has repeatedly recognized, they "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Commission ⌊₂action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (citation omitted).

In adopting the Reform Act, Congress affirmed that "[p]rivate securities litigation is an indispensable tool with which defrauded investors can recover their losses." It further stated that private lawsuits "promote public and global confidence in our capital markets and help to deter wrongdoing and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs." Joint Explanatory Statement of the Committee of Conference, Conference Report on Securities Litigation Reform, H.R. Conf. Rep. No. 104–369, at 31 (Nov. 28, 1995) ("Conf.Rep.").

Congress sought through the Reform Act's lead plaintiff provisions, 15 U.S.C. § 78u–4(a), to ensure more effective representation of investors' interests in private securities class actions by transferring control of the actions from lawyers to investors. Conf. Rep. 32–35. The Act establishes specific procedures and criteria for the appointment of lead plaintiff; it

further provides that the lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)–(II) & (v).

Other provisions of the Reform Act, including 15 U.S.C. § 78o(c)(8), target practices surrounding private securities litigation that Congress regarded as abusive. Among these is the use of so-called professional plaintiffs by law firms.

⌊₃Based upon statutory language, purpose, and history, the Commission believes that 15 U.S.C. § 78o(c)(8) prohibits a certain practice: brokers, dealers, and associated persons recruiting plaintiffs for attorneys in exchange for referral fees. In the Commission's view, the provision does not apply to *bona fide* reimbursement of reasonable expenses of generating address labels and mailing information to investors.

The issue of the interpretation of 15 U.S.C. § 78o(c)(8) appears to have arisen in this case because of attempts to amass the largest lead plaintiff "group." The Commission wishes to make clear that the amalgamation of large numbers of unrelated shareholders into a proposed lead plaintiff group is a serious concern because such a "group" cannot provide the kind of monitoring that the Reform Act contemplates. But this is a concern that can be dealt with through proper application of the Reform Act's lead plaintiff provisions, 15 U.S.C. § 78u–4(a), and should not be addressed through a strained interpretation of the word "remuneration" in 15 U.S.C. § 78o(c)(8). In the Commission's view, a lead plaintiff "group" should generally be limited to three to five members, and thus be able to actively oversee the conduct of the litigation and monitor the effectiveness of counsel for the protection of the class.[1]

---

1. Because the Commission concludes that the conduct described in the Court's October 7 order does not violate 15 U.S.C. § 78o(c)(8), this memorandum does not address whether, if the broker/dealers violate that section, the law firms paying the expenses might violate 18 U.S.C. § 2. Nor does the Commission take a position on any other issue not discussed in this memorandum, such as whether the conduct described in the Court's order: (1) violates state bar rules on attorney solicitation, advertising, or contact with represented persons; (2) violates Federal Rule of Civil Procedure 23 regarding attorney contact with class members; or (3) "constitutes acts of unfair and illegal competition * * * in violation of federal and state law."

References herein to "NALPG" are to the 2,000–member Network Associates Lead Plaintiff Group, represented by Milberg Weiss

## THE STATUTORY PROVISION AT ISSUE

The Reform Act provision at issue in this case was enacted in the following form and codified at Section 15(c)(8) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(c)(8):

TITLE I—REDUCTION OF ABUSIVE LITIGATION

\* \* \* \* \* \*

SEC. 103. ELIMINATION OF CERTAIN ABUSIVE PRACTICES.

(a) PROHIBITION OF REFERRAL FEES.—Section 15(c) of the Securities Exchange Act of 1934 (15 U.S.C. § 78*o*(c)) is amended by adding at the end the following new paragraph:

"(8) PROHIBITION OF REFERRAL FEES.—No broker or dealer, or person associated with a broker or dealer, may solicit or accept, directly or indirectly, remuneration for assisting an attorney in obtaining the representation of any person in any private action arising under this title or under the Securities Act of 1933."

It was enacted as one of two provisions in Title I, Section 103 of the Reform Act. The other, Section 103(b), codified at 15 U.S.C. § 77t(f) and 15 U.S.C. § 78u(d)(4), is a prohibition on attorneys' fees paid from Commission disgorgement funds.

The Reform Act also contains a provision, entitled "Early Notice to Class Members," which states:

Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class—

(I) of the pendency of the action, the claims asserted therein, and the purported class period; and

(II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

\* \* \* \* \* \*

If more than one action on behalf of a class asserting substantially the same claim or claims arising under this title is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with [the above].

15 U.S.C. § 78u–4(a)(3)(A).

## DISCUSSION

THE LANGUAGE, PURPOSE, AND HISTORY OF 15 U.S.C. § 78*o*(c)(8) SHOW THAT THE "REMUNERATION" PROHIBITED BY THAT PROVISION IS PAYMENT FOR THE VALUE OF REFERRING POTENTIAL CLIENTS, NOT REIMBURSEMENT OF REASONABLE EXPENSES.

Section 15(c)(8), 15 U.S.C. § 78*o*(c)(8), prohibits a broker, dealer, or associated person from soliciting or accepting "remuneration for assisting an attorney in obtaining the representation of any person in any private action arising under" the Securities Act of 1933 or the Securities Exchange Act of 1934. "Remuneration" is a broad term that is used in many legal contexts and might, in some contexts, include reimbursement of expenses. However, the language, purposes, and history of the Reform Act all demonstrate that the term, as used in § 15(c)(8), does not encompass the *bona fide* reimbursement of expenses.

The starting point in interpreting Section 15(c)(8) is, of course, its language. *See Moskal v. United States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (" 'In determining the scope of a statute, we look first to its language,' giving the

---

Bershad Hynes & Lerach, Kirby McInerny & Squire, and Barrack Rodos & Bacine; "NIG" refers to the 3,400-member Network Institu-

tional Group, represented by Weiss & Yourman and Stull Stull & Brody.

'words used' their 'ordinary meaning.'"). To ascertain the meaning of statutory language, courts consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Courts are not limited to "'a single sentence or member of a sentence, but look[ ] to the provisions of the whole law, and to its object and policy.'" *John Hancock Mutual Life Ins. Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 94–95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993). They often consult legislative history as a source of information about statutory purpose, *see Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 1916, 1917, 141 L.Ed.2d 111 (1998); *Dunn v. CFTC*, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997); *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772–74, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983), and, more generally, "'to resolve statutory ambiguity,'" *see Patterson v. Shumate*, 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).[2]

**A.** *A Well–Established Meaning of Remuneration Is Payment* for the Value of a Service.

As even the opposing parties in this case seem to acknowledge, the language "remuneration for assisting an attorney in obtaining the representation of any person" in Section 15(c)(8) describes a service provided by a broker/dealer to an attorney. Remuneration is thus used in § 15(c)(8) in the context of a payment by one commercial actor to another for a service.

This is a common use of the word. As one court has stated, remuneration "'is generally defined as payment for services performed.'" *Buss v. Unemployment Compensation Bd. of Review*, 487 Pa. 610, 410 A.2d 779, 781 (1980); *accord, e.g., Worcester Telegram Publishing Co. v. Director of Div. of Employment Security*, 347 Mass. 505, 198 N.E.2d 892, 898 (1964) ("remuneration paid for services rendered").[3] A court interpreting a statute prohibiting referral fees in Medicare programs defined remuneration as "an equivalent for service." *See United States v. Greber*, 760 F.2d 68, 71 (3d Cir.1985).

An equivalent for a service suggests some payment for the value, not merely the cost, of the service. Both case law[4]

**2.** Where it is appropriate to consult legislative history, courts frequently rely on explanatory floor statements made by leading proponents of the legislation during the course of passage. *See, e.g., Metropolitan Edison*, 460 U.S. at 772–74, 103 S.Ct. 1556 (examining "the context of the statute," including "[t]he statements of two [of its] principal sponsors" and "the congressional concerns that lead to [its] enactment"); *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 522, 523, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989); *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); *Red Ball Motor Freight, Inc. v. Shannon*, 377 U.S. 311, 318, 84 S.Ct. 1260, 12 L.Ed.2d 341 (1964); *Yang v. State of California*, 183 F.3d 953, 959–60 (9th Cir.1999).

**3.** *See also, e.g., State ex rel. Murphy v. Welch & Brown*, 187 Okla. 470, 103 P.2d 533, 534 (1940) ("It is clear that the secretary was not an employee for 'remuneration' as that term is defined, since she received no compensation for her services."); *LaBelle v. State Employees Retirement System*, 265 Ill.App.3d 733, 202 Ill.Dec. 766, 638 N.E.2d 412, 415 (2 Dist.1994) (state regulation regarding payment of nonoccupational disability benefits defines "remuneration" as "'any compensation for personal services including fees, wages, salary, commissions, and similar items'"); *In the Matter of Noss*, 133 A.D.2d 510, 519 N.Y.S.2d 431, 432–33 (3 Dept.1987) ("strike benefits paid by labor unions to their members are not considered remuneration within the meaning of the Unemployment Insurance Law so long as the payments are not conditioned upon the rendering of services to the union").

**4.** *See, e.g., In re Bargain Busters, Inc.*, 130 Vt. 112, 287 A.2d 554, 556, 557 (1972) (where newspaper publisher hired salesmen "to solicit and procure advertisements from prospective customers," "remuneration" under unemployment compensation law is "payment for the time and effort of the salesmen in performing a personal service for the company in the furtherance, and for the benefit, of its business"); *Anchor Coal Co. v. Public Serv. Comm'n*, 123 W.Va. 439, 15 S.E.2d 406, 409 (1941) ("[r]emuneration should include a fair profit on the performance of any service"); *Martelli v. R.A. Chambers & Assocs.*, 99 Or.

and dictionaries[5] support this point. Indeed, remuneration is commonly used to connote benefit or gain.[6]

A number of cases illustrate that the word remuneration has a well-established meaning of compensation, which is distinct from mere reimbursement of expenses. In *Bloomgarden v. Coyer*, 479 F.2d 201, 204–12 (D.C.Cir.1973), a case involving a claim for a finder's fee for introducing businesspeople, the court described remuneration as compensation, recompense, reward, payment, benefit, "*quid pro quo* for value conferred," and "the value of services which have inured to another's benefit."

In *United States v. Wood*, 943 F.2d 1048, 1051 (9th Cir.1991), involving whether a broker or trader has customers for purposes of a tax code section providing that property is not a capital asset if held for sale to customers, the court stated:

> A dealer is a person who purchases the securities or commodities with the expectation of realizing a profit "not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will pur-

5. Under the definition of "pay," *Webster's Third New International Dictionary of the English Language* 1659 (Unabridged ed.1993) states that "REMUNERATE, generally more formal than PAY, is applicable to rewards *generous*, not contracted for, or unexpected <the king *remunerated* his retainers with large grants>." *See The American Heritage Dictionary of the English Language* 1527 (3d ed.1996) ("1. To pay (a person) a *suitable* equivalent in return for goods provided, services rendered, or losses incurred; recompense. 2. To compensate for; make payment for: *remunerate* his efforts."); *Funk & Wagnalls New International Dictionary of the English Language* 1066 (Comprehensive ed. 1997) ("To make *just or adequate* return to or for; compensate; pay or pay for; reward."); *Barron's Dictionary of Business Terms* 515 (2d ed. 1994) ("REMUNERATION direct or indirect compensation for services performed. WAGES are a form of direct remuneration, while fringe benefits are a form of indirect remuneration."). (Underlining added.)

6. *See, e.g., Beets v. Johnson*, 180 F.3d 190, 195 (5th Cir.1999) (equating "remuneration" with "benefit"), *citing Beets v. State*, 767 S.W.2d 711, 734–37 (Tex.Crim.App.1987) (quoting dictionary, " 'Remunerate frequently adds to compensate the implication of reward;' " and describing remuneration in terms of "pecuni-

App. 524, 783 P.2d 31, 33 (1989) (remuneration contemplates "*quid pro quo* between payment and services"); *Kirby v. Indiana Employment Security Bd.*, 158 Ind.App. 643, 304 N.E.2d 225, 227, 228 (3 Dist.1973) (state employment security act defines "remuneration" as "all compensation for personal services," which "words describe a situation where workers perform services directly or indirectly for another, receiving a *quid pro quo* in return").

ary gain," "some benefit or compensation," "gain or reward," "gain or profit"); *United States v. Covarrubias*, 179 F.3d 1219, 1226 (9th Cir.1999) ("The defendants' motive in committing both crimes was identical: they sought to obtain financial remuneration for transporting * * * immigrants."); *United States v. Universal Trade and Indus., Inc.*, 695 F.2d 1151, 1153 (9th Cir.1983) (doctor was paid, as remuneration, "a percentage of the profits [of medical laboratory] equivalent to a percentage of the gross revenues, so he would have an incentive to order extensive laboratory tests on as many patients as possible"); *United States v. Duz–Mor Diagnostic Laboratory, Inc.*, 650 F.2d 223, (9th Cir.1981) (lab accused of "offering to pay a remuneration as an inducement for the referral of medical services"); *Bennett v. United States*, 399 F.2d 740, 742 (9th Cir.1968) ("On many occasions the bank loaned money to individuals procured by [an intermediary]. As remuneration for bringing business to the bank, [the intermediary] received a portion of the 'points' * * * charged for the loans."); *Anglo California Nat'l Bank v. Lazard*, 106 F.2d 693, 698 (9th Cir.1939) (equating "remuneration" with "reward"); *Trotter v. Nelson*, 684 N.E.2d 1150, 1152 (Ind.1997) (describing as remuneration the compensation or reward under an arrangement whereby clerical employee of law firm received 5% "of any fees which resulted from a personal injury or worker's compensation case that she had a role in referring to [her attorney boss]"); *Ludington Service Corp. v. Acting Comm'r of Ins.*, 444 Mich. 481, 511 N.W.2d 661, 666, 667 (1994) (dividends paid to real estate brokers based on profits of title companies incorporated by them, sometimes "proportionate to the amount of referral business expected to be generated by each broker," would be "direct remuneration in violation of" state insurance code).

chase from them at a price *in excess of their cost. This excess or mark-up represents remuneration* for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods." [Emphasis added.]

And in *Upton v. Trinidad Petroleum Corp.*, 652 F.2d 424, 426 (5th Cir.1981), the court interpreted an Alabama private offering exemption that required that "[n]o commission or other remuneration [be] paid or given directly or indirectly for soliciting any prospective buyer." It held that because the offerors of interests in a planned oil well had "collected funds from the investors which greatly exceeded the actual costs attributable to the drilling of" the well, they had received remuneration, and the interests in the well were not exempt from registration. *Id.* at 426–27; *accord Petroleum Resource Dev. Corp. v. State*, 585 P.2d 346, 347–48 (Okla.1978).

On the other hand, the word remuneration is at times used in a context that suggests that it can encompass the reimbursement of expenses. For example, in Commission Rule 14a–2(a)(1)(i), 17 C.F.R. § 240.14a–2(a)(1)(i) (1994), a proxy solicitation is exempt from certain rules if, among other requirements, the securities holder making the solicitation "[r]eceives no commission or remuneration for such solicitation, directly or indirectly, other than reimbursement of reasonable expenses." The word remuneration is defined in one major dictionary as: "Payment; reimbursement. Reward; recompense; salary; compensation." *Black's Law Dictionary* 1296 (6th ed.1990). Another dictionary defines "remunerate" as "1: to pay an equivalent for (as a service, loss, expense) 2: to pay an equivalent to (a person) for a service, loss, or expense: RECOMPENSE, COMPENSATE syn see PAY." *Webster's Third New International Dictionary of the English Language* 1921 (Unabridged ed.1993). Moreover, some cases suggest that remuneration can include cost reimbursement.[7]

These cases do not, however, appear to suggest that the mere reimbursement of out-of-pocket expenses constitutes remuneration. Courts typically refer to remuneration in the context of discussing an overall sum that includes or covers reimbursement of expenses, or even as a cost-reimbursement item in a larger compensation package.[8] One person might reimburse another person's costs, unrelated to

---

**7.** *See United States v. National Treasury Employees Union*, 513 U.S. 454, 469, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("The honoraria ban is unlikely to reduce significantly the number of appearances by high-ranking officials as long as travel expense reimbursement for the speaker and one relative is available as an alternative form of remuneration."); *Price Fire & Water Proofing Co. v. United States*, 261 U.S. 179, 180–81, 43 S.Ct. 299, 67 L.Ed. 602 (1923) (in awarding fair and just compensation, Court of Claims could not "include in the award 'prospective or possible profits on any part of the contract beyond the goods and supplies delivered to and accepted * * * and a reasonable remuneration for expenditures and obligations or liabilities necessarily incurred in performing or preparing to perform' the contract"); *PPG Indus., Inc. v. NLRB*, 671 F.2d 817, 819 (4th Cir.1982) (in determining whether in-plant organization committee was agent of union, noting that members were asked to distribute literature but were not "reimbursed for expenses nor did they receive any other remuneration from the Union"); *Hatfield v. Richardson*, 380 F.Supp. 1048, 1050 (D.Kan.1974) (quoting agency decision, " 'how much of the remuneration received by the claimant was for actual out-of-pocket expenses and how much was remuneration for work rendered' ").

**8.** *See note 7, supra; see also Tonti v. Petropoulous*, 656 F.2d 212, 221 (6th Cir.1981) (referring to court-awarded litigation costs that accompany an award of attorney's fees); *Seiple v. Prudential Ins. Co.*, 1994 WL 702931, at *3 (E.D.Pa. Dec.13, 1994) (employer reimburses costs of some outside training); *compare American Airlines, Inc. v. United States*, 40 Fed. Cl. 712 (1998) (per diem payments for meals and travel expenses for overnight trips were remuneration subject to withholding), *cited by NALPG, with Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978) (reimbursement of lunch expenses on non-overnight travel was not remuneration subject to withholding).

their transaction, or in an amount that provides a residual benefit, as a payoff for favors.[9] |₁₃*Webster's* reference to remuneration as an "equivalent for expense" need not mean the amount of the expenses; rather, it could mean the value of the benefit conferred by virtue of the expenses having been incurred.[10] A person might accept reimbursement in lieu of remuneration. In none of these usages need remuneration mean cost reimbursement alone.[11]

B. *Other Language of the Reform Act, the Act's Purposes, and Its History Show That in the Context of 15 U.S.C. 78o(c)(8), Remuneration Means a Referral Fee.*

At most, NALPG has demonstrated that the word remuneration is ambiguous. Under such a circumstance, it is appropriate to look to other language in the Reform Act, to the Act's purposes, and to its legislative history to determine what meaning Congress ascribed to the term when it adopted Section 15(c)(8). These sources show that remuneration in this context means compensation for referring potential clients, i.e., a referral fee.

To begin with, Section 15(c)(8)'s heading is "Prohibition of Referral Fees." The Supreme Court has stated that " 'the title of a statute and the heading of a section' are 'tools available for |₁₄the resolution of a doubt' about the meaning of a statute." *Almendarez–Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 1226, 140 L.Ed.2d 350 (1998).

The Reform Act does not define "referral fees." Usually such fees take the form of a payment of a percentage or lump sum which is contingent on the outcome and fruits of the referral or the form of lump sum incentive payments per person referred.[12] None of the parties has cited an

9. *See Polk County v. Peters,* 800 F.Supp. 1451, 1456 (E.D.Tex.1992) (part of "recruitment agreement" between hospital and doctor is "reimbursement for malpractice insurance").

10. *See, e.g., Charles Bridge v. Warren Bridge,* 36 U.S. 420, 467, 529, 11 Pet. 420, 9 L.Ed. 773 (1837) ("upon the positive assurance of remuneration, in some other form [than exclusive contracts], capital and enterprise can always be commanded. * * * The grant is intended as a benefit, as a remuneration for risks, and for advances of capital * * *."); *Bloomgarden,* 479 F.2d 201 (claim for value of services provided, not expenses).

11. NALPG also cites cases using "remuneration" to refer to loss or damages, *see Lake Shore & M.S. Ry. Co. v. Prentice,* 147 U.S. 101, 108, 13 S.Ct. 261, 37 L.Ed. 97 (1893); *Panos v. Island Gem Enters., Ltd.,* 880 F.Supp. 169, 176 (S.D.N.Y.1995), but that is not the context in which the word is used in Section 15(c)(8).

12. *See, e.g., United States v. Starks,* 157 F.3d 833, 836 (11th Cir.1998) (company offering drug treatment paid community health aides "$250 for each patient they referred: $125 when a referred woman began inpatient drug treatment with [the company] and $125 after each such woman had stayed in [the] program for two weeks"); *United States v. Marbella,* 73 F.3d 1508, 1510 (9th Cir.1996) (receipt of percentage of an insurance settlement for referring accident victims to a medical clinic and/or law firm); *United States v. Kats,* 871 F.2d 105, 106–07 (9th Cir.1989) (owner of lab pays 50% of Medicare payments received as consequence of referrals from medical services company); *Overseas Development Disc Corp. v. Sangamo Constr. Co.,* 840 F.2d 1319, 1329 (7th Cir.1988) ("Because there is no certain way to measure influence and access, the construction market adopts a percentage of the project as the most reliable measure and the one that provides the right incentives to the [business] brokers at the right price to their clients."); *Sirianni v. SEC,* 677 F.2d 1284, 1287 (9th Cir.1982) (representative of seller of mutual funds received referral fee of 15% of amount of any investment of anyone referred by him to enterprises holding coal mining leases); *Bell v. Health–Mor, Inc.,* 549 F.2d 342, 344 (5th Cir.1977) (vacuum cleaner salesman "received $10 for the name of each potential customer he submits to the sellers"); *Guernsey v. Rich Plan of the Midwest,* 408 F.Supp. 582, 589 (N.D.Ind.1976) (persons "would receive twenty dollars each for each successful referral sale after they had purchased an FFSA [Food and Freezer Service Agreement] costing [$499]"); *Manning v. Princeton Consumer Discount Co.,* 397 F.Supp. 504, 506 (E.D.Pa.1975) (financing agency paid auto dealer "a 5% Referral fee on the transaction * * * involving cars sold by [dealer] and financed by [agency]"); *Palmer v. Breyfogle,* 217 Kan. 128, 535 P.2d 955, 965 (1975) ("[F]or many years it was customary in Kansas for a forwarding attorney to receive one-third of any fee which was generated in a particular lawsuit."); *People v. Palma,* 40 Cal. App.4th 1559, 48 Cal.Rptr.2d 334, 336 (2 Dist.1995) (flat fee paid per Medi-cal sticker

example of a [15]referral fee that is in the form of mere reimbursement for the out-of-pocket cost of making the referral.

As a provision targeted at this particular abusive practice, Section 15(c)(8) fits within one of the well-recognized purposes of the Reform Act: to curb the use of so-called professional or figurehead plaintiffs who would serve the interests of plaintiffs' lawyers, not the class. This purpose is plain on the face of the statute, reflected in numerous of its provisions. *See In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 813–14 (N.D.Ohio 1999).

For example, the Reform Act essentially bars from the lead plaintiff role a person who has been lead plaintiff in more than five securities class actions in three years (unless the court otherwise permits); a person who does not read the complaint before a lawsuit is filed in his or her name; a person who buys the stock at the direction of an attorney or to participate in litigation; or, most notably, a person who receives a bounty payment for serving as a class representative. *See* 15 U.S.C. § 78u–4(a)(2)(A), (a)(3)(B)(vi), (a)(4). And although the largest [16]financial interest requirement, 78u–4(a)(3)(B)(iii), serves the larger goal of appointment of the "most

adequate plaintiff," it also "serves to prevent a nominal plaintiff from ever becoming the lead plaintiff." *Telxon,* 1999 WL 826076, at *10.

The objective of Section 15(c)(8), like the provision prohibiting bounty payments to plaintiffs, was to prevent lawyers from offering incentives to recruit plaintiffs.[13] Such plaintiffs would serve the interests of the lawyers, not the class. Thus, unless a payment by an attorney would give the broker/dealer an inducement to serve the attorney's interests, it would not pose the risk of abuse with which the statute is concerned. It is difficult to see how the mere reimbursement of out-of-pocket expenses, which puts the broker/dealer in no better position than if it had not provided mailing assistance, could be an inducement to the broker/dealer to do the attorney's bidding.

The legislative history of Section 15(c)(8) provides further support for interpreting remuneration to mean referral fees. The provision originated in 1991 Congressional testimony by the Securities Industry Association and Coopers & Lybrand. These organizations proposed it in hearings on private securities [17]litigation reform as one of a number of specific measures to curtail the use of incentive payments by attorneys to recruit plaintiffs.[14] By August 1992, the

for bringing in orders); *E & B Marketing Enterprises, Inc. v. Ryan,* 209 Ill.App.3d 626, 154 Ill.Dec. 339, 568 N.E.2d 339, 340 (1 Dist.1991) (agreement to promote doctor's practice through marketing campaign targeted at insurers for a "consultant's fee of 10% on all billings collected by [the doctor] in connection with such referrals"); *Smith v. Johnston,* 73 Ill.App.3d 601, 29 Ill.Dec. 409, 391 N.E.2d 1092 (2 Dist.1979) (referral fee of 20% of total commission earned on real estate sale).

13. In discussing the vices of a referral fee arrangement in *Trotter,* 684 N.E.2d at 1154–55, the court noted that it "provides the incentive for a nonlawyer to recommend an attorney's services for their own pecuniary interests." *See Moses v. Citicorp Mortgage, Inc.,* 982 F.Supp. 897 (E.D.N.Y.1997) (allegation that mortgage company paid mortgage brokers a referral fee, or premium, if brokers referred clients who would pay inflated rates); *Golon v. Ohio Savings Bank,* 1999 WL 184402 (N.D.Ill. Mar.29, 1999) (payments to influence broker's choice of mortgage company).

14. *See Securities Investors Legal Rights: Hearing Before the Subcomm. on Communications and Finance of the House Comm. on Energy and Commerce,* 102nd Cong., 1st Sess., at 92 (Nov. 21, 1991) (Testimony of Philip A. Lacovara, General Counsel, Morgan Stanley & Co., on behalf of SIA) ("the SIA and other groups that are concerned about unwarranted securities fraud litigation urge adoption of legislation designed to rid the system of baseless, harassment suits," including "[a]bolition of abusive practices—Prohibit the payment of bounties to named plaintiffs, payments to stockbrokers for referring plaintiffs, and law firms' use of their profit-sharing plans as a means of providing in-house plaintiffs. Each of these practices contribute to the manufacture of lawsuits under the securities laws that are designed to coerce settlements."); at 155 (Testimony of Vincent M. O'Reilly, Deputy Chairman, Coopers & Lybrand) ("By adopting provisions to minimize frivolous suits, you can better direct the legal system toward assisting legitimate victims of fraud. * * * * Attorneys should be prohibited from paying

proposal appeared in early House and Senate versions of reform legislation, and it was also part of bills introduced in 1993 and 1994.[15]

In 1995, the referral fee provision enjoyed wide support in congressional hearings (although little, if any, empirical evidence was adduced about the practice). It was not only included in the leading House and Senate bills,[16] but also |₁₈in every major alternative bill introduced.[17] Even an organization of plaintiffs' counsel, the National Association of Securities and Commercial Law Attorneys, testified that "NASCAT supports *targeted* efforts to address a number of issues involved in securities litigation, including measures in the pending bills that would * * * [b]an referral fees."[18]

The most extensive discussion of Section 15(c)(8) by lawmakers took place during the floor debate on the Reform Act. The

Statement of Managers in the Reform Act Conference Report does not mention the provision at all. The House and Senate Reports each contain a single sentence on it.[19]

|₁₉In floor debate, leading proponents of the Reform Act stated that Section 15(c)(8), like certain other provisions, sought to curb the use of professional plaintiffs in bringing frivolous securities lawsuits. Invariably, sponsors and managers of the legislation discussed § 15(c)(8) in terms of "referral fees" or "bonuses." They often discussed it in conjunction with the bill's prohibition on "bounty" payments to class representatives.

For example, Senator Domenici, one of the original co-sponsors of the bill and one of its managers, stated:

[The bill] eliminates many of the unfair practices currently associated with generating a securities class action.

---

'finders' fees' or 'bounties' to induce potential plaintiffs to sue.").

**15.** *See* H.R. 5828 (Aug. 11, 1992) (Reps. Tauzin, Lent, Hall of Texas, Ritter); S. 3181 (Aug. 12, 1992) (Sens.Domenici, Sanford); H.R. 417 (Jan. 5, 1993) (Reps. Tauzin, Parker, Hall of Texas, Rowland, Montgomery, Shaw, Machtley, Moran); S.1976 (Mar. 24, 1994) (Sens.Dodd, Domenici, Mikulski, Johnston, Faircloth).

**16.** *See* S. 240 (Jan. 18, 1995) (Sens.Domenici, Dodd, Hatch, Mikulski, Bennett, Moseley–Braun, Lott, Murray, Mack, Johnston, Faircloth, Conrad, Burns, Chafee, Gorton, Helms, Kyl, Thomas, Hutchison, Santorum, Pell); H.R. 10 (Jan. 4, 1995) (Reps. Hyde, Ramstad, Chenowith, Condit, *et al.*), *superseded in relevant part by* H.R. 1058 (Feb. 27, 1995) (Reps. Blilely, Fields of Texas, Cox of California, Tauzin).

**17.** *See* S. 667 (Apr. 4, 1995) (Sens.Bryan, Shelby); H.R. 555 (Jan. 18, 1995) (Reps. Markey, Conyers, Nadler, Kennedy of Massachusetts, Schroeder); H.R. 675 (Jan. 25, 1995) (Reps.Mineta, Eshoo); H.R. 681 (Jan. 25, 1995) (Reps. Tauzin, Hall of Texas, Towns, Rush, Brown of Ohio). The language of all of these bills, as well as H.R. 10 and H.R. 1058, tracked the provision in S. 240, except for Representative Tauzin's bill, which was in the same form as he had introduced it in 1992 and 1993 and was phrased as "pay a fee." In

1995, Representative Tauzin joined the sponsors of H.R. 1058.

**18.** *Securities Litigation Reform Proposals: Hearing Before the Subcomm. on Securities of the Senate Committee on Banking, Housing, and Urban Affairs,* 104th Cong., 1st Sess., 185 (Mar. 22, 1995) (Statement of David J. Guin on behalf of NASCAT) (emphasis in original).

**19.** *See* Report on the Common Sense Legal Reform Act of 1995, H.R. Rep. No. 104–50(I), 37–38 (Feb. 24, 1995) ("Section 203. Prevention of Abusive Practices That Foment Litigation. * * * Section 203(b) amends Section 15(c) of the Exchange Act by adding a new paragraph prohibiting brokers, dealers, or their affiliated persons from soliciting or accepting fees for assisting attorneys in obtaining representation of their customers."); Report on the Private Securities Litigation Reform Act of 1995, S.Rep. No. 104–98, 24 (June 19, 1995) ("Title I—Reduction of Abusive Litigation. Section 101. Elimination of certain abusive practices. Section 101(a) amends the Securities Exchange Act of 1934 (the '1934 Act') by adding a new paragraph (8) to Section 15(c), prohibiting brokers or dealers or any associated persons from soliciting or receiving any type of fee or remuneration for assisting an attorney in obtaining representation of any person in private actions under the Securities Act of 1933 (the '1933 Act') or the 1934 Act.").

Lawyers will no longer be able to pay bonuses out of the settlement fund to individuals who lend their name to the lawsuit and act as the named plaintiff. *Nor will they be allowed to pay bonuses to brokers or dealers for referring potential clients.*

141 Cong. Rec. S17969 (Dec. 5, 1995) (emphasis added). Senator D'Amato, another manager of the bill, explained that it "discourages the use of professional plaintiffs by eliminating bonus payments to name plaintiffs and prohibiting referral fees." *Id.* at S17934 (Dec. 5, 1995). And Senator Mikulski, a sponsor of the bill, stated:

[L]et us stop the bounty hunters. This bill says that lawyers can't shop around for clients. I mean—a lawyer will not be able to pay a commission to someone else to find them a client. I have heard of instances where lawyers seek out clients just so they can have cases to litigate. * * * Accountants tell me that some attorneys pay stockbrokers, and others, in return for information about possible lawsuits and possible clients. That is unacceptable. Courts are for protecting the rights of people and pro-

moting fairness, not for frivolous lawsuits.

*Id.* at S9173 (June 27, 1995).[20]

These views were shared by opponents of the Reform Act, who, as noted, nonetheless supported Section 15(c)(8) and even included it in alternative bills. Senator Bryan, the co-sponsor with Senator Shelby of the alternative bill in the Senate, said:

[P]rohibit[ing] the payment of referral fees to brokers * * * is legitimate and is designed specifically to deal with the issue of potential frivolous lawsuits. The concern is that we should not give stockbrokers, or anyone else, incentives for referral of potential securities fraud cases, and, indeed, these actions ought to be prohibited and the legislation does that. * * * The referral fees to brokers, the bonus payments, [and certain other provisions] * * * "[t]hat, my friends, is what frivolous lawsuit legislation reform ought to be about."

141 Cong. Rec. S17944 (Dec. 5, 1995). Senator Shelby explained that "prohibiting referral fees" is "aimed at * * * eliminating incentives for frivolous and abusive litigation." *Id.* at S8966 (June 23, 1995).[21]

---

**20.** *See, e.g.,* 141 Cong. Rec. H2755 (Mar. 7, 1995) (Rep.Bliley) ("Most Members of Congress now understand and agree with us that lawyers should not pay referral fees to brokers who send them clients, or that named plaintiffs should be barred from receiving bounty payments."); *id.* at S8892 (June 22, 1995) (Sen.D'Amato) ("S. 240 discourages the use of professional plaintiffs by eliminating the bonus payments to plaintiffs and prohibiting referral fees."); *id.* at S9040 (June 26, 1995) (Sen.Domenici) (bill "stops brokers from selling names of investors to lawyers"); *id.* at S9074 (June 26, 1995) (Sen.Hatch) ("Often, the firms [involved in abusive strike suits] use the same professional plaintiffs in multiple suits. Some will pay referral fees to get plaintiffs."); *id.* at S9209 (June 28, 1995) (Sen.Chafee) ("S. 240 seeks to reduce abusive practices by prohibiting brokers or dealers from receiving a referral fee from attorneys seeking clients for class action suits; * * * [i]t seeks to limit frivolous lawsuits by eliminating professional plaintiffs"); *id.* at 9212 (June 28, 1995) (Sen.Domenici) (bill "stops brokers from selling names of investors to lawyers"); *id.* at S17993 (Dec. 5, 1995) (Sen.Grams) (to deal with "the high cost of meritless and abusive litigation," the bill "[e]liminat[es][ ] bounty payments to named plaintiff, [and] plaintiff referral fees").

**21.** *See id.* at S17995 (Dec. 5, 1995) (Sen.Bryan) ("bonus payments being paid to brokers * * * is dead wrong. * * * [P]ayments that would be made as bonus payments to certain plaintiffs are wrong as well."); *id.* at S19056 (Dec. 21, 1995) (Sen.Bryan) ("There has been a practice that has grown up that ought to be eliminated. That is the payment of referral fees to brokers. We ought not give incentives to brokers to refer potential security fraud to class action lawyers. So this legislation, my friends, prohibits the payment of referral fees to brokers."); *see also id.* at S9208–09 (June 28, 1995) (Sen.Lautenberg) (discussing "prohibitions against referral fees and * * * requirements that the share of the settlement awarded to the name plaintiffs be calculated in the same manner as the shares awarded to all other members of the class and that the name plaintiff certify that he did not purchase the security at the direction of his attorney"); *id.* at S9093 (June 26, 1995) (Sen.Sarbanes) ("There is a provision called no bonus to the

Statements at hearings that preceded the [22]floor debates reflect this same understanding of the provision.[22]

The Commission therefore disagrees with a submission by one of NALPG's counsel in another case asserting that payment of postage and label costs is "the very abusive practice Congress sought to eliminate." Memorandum of Law filed September 10, 1999 in *In re Landry's Seafood Restaurants, Inc. Sec. Litig.*, No. H–99–1948 (S.D.Tex.), at 2. The only direct evidence cited for this proposition is a single phrase, in the Senate Report on the Reform Act, that the provision bars "any type of fee or remuneration." But this begs the question of what is meant by [23]remuneration. It is too insubstantial a basis for concluding, as NALPG insists, that Section 15(c)(8) *must* apply even to reimbursement of postage.[23]

### C. *NALPG's Policy Arguments Are Unpersuasive.*

NALPG's interpretation of Section 15(c)(8) is neither dictated by the language, purposes, and history of the Reform Act, nor mandated by policy considerations. NALPG and/or its counsel argue that unless Section 15(c)(8) is interpreted to outlaw even the reimbursement of postage costs, it would: (1) be impossible to enforce; (2) raise "very serious concerns regarding customer confidentiality" and the prospect that "every time a major securities fraud is exposed, investors are going to be inundated with competing solicitation packages from different law firms"; (3) create a system where "at the end of the day * * * the ability to represent a class does not depend upon one's capacities as a litigator, but it depends upon one's capacities to do marketing"; (4) result in investors being misled and manipulated, defeating the Reform Act's purpose of knowing client participation in the formation of a lead plaintiff "group," in the selection of counsel, and in the conduct and resolution of the litigation; and (5) "result in securities class actions involving thousands of so-called lead plaintiffs with all the [24]management problems that entails." Although these may be valid policy concerns, they are not sufficient rea-

named plaintiff, which has been going on, which we do not think ought to be happening. The lawyer cannot pay brokers for referring clients. * * * Those professional plaintiffs can be knocked out by all of those provisions that I am talking about."); *id.* at S9172 (June 27, 1995) (Sen.Dorgan) ("[The bill] prohibits bonus payments and referral fees which may create an incentive to file frivolous cases."); *id.* at S17974 (Dec. 5, 1995) (Sen.Boxer) ("We should also ban the payment of referral fees to stockbrokers who drum up plaintiffs and litigation for plaintiffs' attorneys. Securities lawsuits should redress real wrongs and not promote strike suits to shake down innocent defendants."); *id.* at S17986 (Dec. 5, 1995) (Sen.Lautenberg) ("prohibitions against referral fees [and other practices]" would "curb frivolous securities lawsuits").

**22.** *See Securities Litigation Reform Proposals: Hearing Before the Subcomm. on Securities of the Senate Committee on Banking, Housing, and Urban Affairs,* 104th Cong., 1st Sess., 9 (Mar. 2, 1995) (Statement of Sen. D'Amato) ("We need to get professional plaintiffs out of the picture by banning the absurd practices of referral fees to brokers and bonus payments

to named plaintiffs."); *Securities Litigation Reform: Hearing Before the Subcomm. on Telecommunications and Finance of the House Committee on Energy and Commerce,* 103rd Cong., 2nd Sess., 3 (July 22, 1994) (Statement of Rep. Markey) ("[I]t is clear that we can improve the process of initiating and managing securities fraud class actions * * * * [T]he unseemly race to the courthouse, the fees allegedly paid by some lawyers to brokers for referrals, and the rare but not unheard of practice of filing form complaints all can and should be addressed."); 5 (Statement of Rep. McMillan) ("In order to discourage these professional plaintiffs, H.R. 417 will forbid the payment of bonuses or bounties to plaintiffs in these class action suits. Third parties·such as stockbrokers will be prohibited from receiving referral fees for finding plaintiffs to participate in these frivolous lawsuits.").

**23.** The Commission disagrees with NIG that Section 15(c)(8) only applies to the initiation of litigation. Its language is broad enough to reach the process of forming a proposed lead plaintiff "group," which could perpetuate a frivolous lawsuit and lead to various class action abuses.

sons to interpret Section 15(c)(8) in the manner NALPG advocates.

The Commission recognizes that the August 16, 1999 order in this case expressed concern (at 3) that if remuneration "were not to encompass reimbursement, brokers could easily circumvent § 78o(c)(8) by arranging their transactions with attorneys such that any compensation they receive is in the form of reimbursement for their costs in providing services to the attorneys." However, a court may go behind an attorney's or broker/dealer's assertion of why it made payments, to determine if those payments were merely for reimbursement of such things as mailing costs. If a *bona fide* reimbursement of expenses is not involved—if the payment is in fact for other services, or represents some sort of bounty or premium to the brokerage firm—the court can take appropriate action. In this regard, established practice with regard to class action certification and settlement notices would seem to provide a ready benchmark for reasonable administrative and mailing expenses.[24]

Moreover, many statutes, including the Reform Act itself, distinguish between prohibited payments, on the one hand, and reasonable expenses or fair market compensation on the other. *See* 15 U.S.C. § 78u–4(a)(4) (prohibiting a bounty payment to a class representative but contemplating recovery of "reasonable costs and expenses (including lost wages) directly relating to the representation of the class").[25] The Commission respectfully submits that such a regime is neither unthinkable nor unworkable.

Concerns about attorney marketing and about investors being misled by a communication from a law firm, signed up as lead plaintiff without their knowledge, and amassed into huge proposed "groups" can equally arise with published notices. These concerns are not distinctive to mailings through broker/dealers.

In its *Report to the President and the Congress on the First Year of Practice Under the Private Securities Litigation Reform Act of 1995* (Apr.1997), the Commission's Office of General Counsel noted (at 65–66) that some lawyers, "[t]aking advantage of [the Act's] provision" allowing appointment of a "group of persons" as lead plaintiff, have attempted "to recruit investors as additional clients." They have done so, the Report explained, by phrasing Reform Act notices "in a way more likely to attract clients, rather than competition from investors (and other law firms) independently vying to be named lead plaintiff."[26]

---

24. *See In re Victor Technologies Sec. Litig.,* 792 F.2d 862, 865 (9th Cir.1986) (in affirming an order requiring plaintiff's counsel to reimburse broker/dealers' costs of distributing a notice of a class action settlement, noting evidence that "brokerage houses, as a matter of business practice, often do not forward such notices unless they are also reimbursed for the administrative costs of searching their records to find the names and addresses of the beneficial owners and for mailing the notices"). We understand from the record in this case that (in addition to postage when the broker/dealer sends out the mailing) the broker/dealers charge either a per-label fee that includes the search costs or separately charge for the materials and labor.

25. *See, e.g.,* Public Utilities Holding Company Act of 1935, 15 U.S.C. § 79g(d)(4) (specifying consequences if "the fees, commissions, or other remuneration, to whomsoever paid, directly or indirectly, in connection with the issue, sale, or distribution of [a] security are not *reasonable*"); *id.,* 15 U.S.C. § 79j(b)(2) (approval of acquisition of securities or utility assets can be withheld if "all fees, commissions, and other remuneration, to whomsoever paid, to be given, directly or indirectly, in connection with such acquisition is not *reasonable* or does not bear a *fair relation* to the sums invested in or the earning capacity of the utility assets"); Investment Company Act of 1940, 15 U.S.C. § 80a–17(e)(2) (regarding transactions of certain affiliated persons and underwriters, limiting remuneration in connection with the sale of securities to "the *usual and customary* broker's commission if the sale is effected on a securities exchange"); *id.,* 15 U.S.C. § 80a–56(k)(2) (similar regarding person in a certain relationship to a business development company acting as a broker). (Emphases added.)

26. One case even seems to suggest that, notwithstanding the Reform Act's language requiring that notice be published once in the first of a series of substantially similar actions, the perceived advantages of publishing

A striking example of abuse is provided by *Parnes v. Digital Lightwave, Inc.*, No. 98–152–CIV–T–24(C) (M.D.Fla.), *appeal pending*, 99–11293–FF (11th Cir.), a case in which at least one member of a ten-person lead plaintiff group (and likely others as well) did not know he was appointed lead plaintiff until after lead counsel had submitted a proposed settlement for court approval. After responding to a law firm's internet notice about the class action, the investor received a series of cryptic mailings from the law firm's non-attorney Shareholder Relations |27 Manager. They did not inform the investor, who signed a certification stating that he was "willing to serve as a representative party," that he had in fact been put forward as a member of a lead plaintiff group, who "our group of plaintiffs" was, what the "lead plaintiff" was, or that multiple lead law firms had been proposed. Although a later mailing said that "the Court appointed a group of plaintiffs represented by this firm and two other firms as lead plaintiffs and appointed this firm and the other two firms as lead counsel," it did not identify the "group of plaintiffs," its function, or the "other firms."

No attorney at the law firm spoke or wrote to the investor until almost six months after he had responded to the law firm's internet notice and a month after a settlement had been reached in the case. Despite the investor's repeated requests over a six-week period, lead counsel did not provide him with the information for which he asked about the action, including a copy of the stipulation of settlement filed with the district court. Only after the court had preliminarily approved the settlement and asked at that hearing if the lead plaintiff group had seen it, did lead counsel send the stipulation to the investor.

Concerns about a proposed lead plaintiff group consisting of too many investors or of investors who may have been misled by counsel, or both, are better addressed under provisions of the Reform Act other than Section 15(c)(8). First, if a notice published or mailed to an investor in a Reform Act case is false, misleading, or inadequate, the court can—and should—take |28 appropriate action, including requiring proper notice, subjecting any affected lead plaintiff motion to intense scrutiny, and disciplining counsel involved with the notice.

Second, as the Commission has argued as *amicus curiae* in *Digital Lightwave* and in other cases,[27] a "person or group of persons" within the meaning of the Reform Act's lead plaintiff provisions, 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I), should be capable of actively overseeing the conduct of the litigation and monitoring the effectiveness of counsel for the protection of the class. To ensure adequate stakes, monitoring, coordination, and accountability, a group generally should have no more than three to five members.[28]

To enable a court to assess whether a proposed group is capable of performing the lead plaintiff function, the "group" should provide appropriate, reasonably available information about the circumstances of its formation and about its members, structure, and intended functioning. Such information should include descriptions of its members, including any pre-existing relationships among them; an explanation of how |29 its members would

---

notices early and often may be reviving the "race to the courthouse" and resulting in the filing of multiple, duplicative complaints. *See Sherleigh Assocs. LLC v. Windmere–Durable Holdings, Inc.*, 184 F.R.D. 688, 694 & n. 4 (S.D.Fla.1999).

**27.** Copies of the Commission's *amicus curiae* briefs on lead plaintiff and lead counsel issues are posted on its internet site (www.sec.gov/news/leglindx.htm).

**28.** There may, of course, be unusual circumstances that warrant departure from these limits. They might include pre-existing relationships among the members or other factors indicating that they have a special capacity to provide able and unified decisionmaking independent of counsel.

function collectively; and a description of the mechanism that its members and the proposed lead counsel have established to communicate with one another about the litigation. If the proposed group fails to explain and justify its composition and structure to the court's satisfaction, its motion should be denied or modified as the court sees fit.

In case after case in which the so-called "aggregation" issue has been litigated or in which courts themselves have addressed it, the courts have refused to appoint large, random assemblages of unrelated persons as lead plaintiff "groups" under the Reform Act. *See, e.g., Wenderhold v. Cylink Corp.*, 188 F.R.D. 577, 583–85 (N.D.Cal. 1999).[29] In one case, one such proposed "group" was so confused and disorganized that the court determined that it did not even meet minimum standards of adequacy of representation under Rule 23. *See Switzenbaum v. Orbital Sciences Corp.*, 187 F.R.D. 246, 248–51 (E.D.Va.1999).

In addition, the Commission has urged district courts to actively exercise their traditional discretion to review proposals for multiple lead counsel. *See, e.g., In re Baan Co. Sec. Litig.*, 186 F.R.D. 214 (D.D.C.1999) (appending SEC *amicus* memorandum). Although the Reform Act gives the lead plaintiff a large role in the choice of lead counsel, and contemplates that a court would impose additional or different counsel on the lead plaintiff only in very unusual circumstances, the selection of counsel remains "subject to the approval of the court." 15 U.S.C. § 78u–4(a)(3)(B)(v). The Commission has argued that greater scrutiny is warranted where it appears that the lead plaintiff has not played an active, effective role in choosing counsel.

With regard to the concerns that mailings will invade the privacy of, or burden, customers of broker/dealers, broker/dealers and their customers can themselves work out solutions to such problems in which they decide whether or not to make or accept the mailings. Or a regulatory scheme truly addressed to such problems could be created.

Finally, NALPG fails to discuss any countervailing policy considerations. Congress specified in 15 U.S.C. § 78u–4(a)(3)(A) that investors must be provided with a notice of the pendency of a class action, the claims asserted therein, the purported class period, and the right to move to be lead plaintiff. If done in conformity with applicable legal and ethical standards, distributing mailings could have the beneficial effect of getting this information to investors. As the 1997 SEC Staff Report on the Reform Act noted (at 66):

> Representatives of institutional investors have informed us that they are having difficulty discovering and reviewing the [Reform Act] notices in a timely fashion. Moreover, other representatives have informed us that once they discover the notice, they have insufficient time to complete the process required to enter the suit.

The effect of mailings could be to encourage additional investors to come forward, negotiate with and retain counsel, and move to be lead plaintiff, thereby en-

---

**29.** *See also In re Baan Company Sec. Litig.*, 186 F.R.D. 214, 216–17 (D.D.C.1999) (collecting cases); *Sherleigh Assocs. LLC v. Windmere–Durable Holdings, Inc.*, 184 F.R.D. 688, 692 & n. 1 (S.D.Fla.1999); *In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346, 352–53 (S.D.Cal.1998); *In re Oxford Health Plans Sec. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998); *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 409 (D.Minn.1998); *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y.1997); *Mitchell v. Complete Mgmt., Inc.*, 1999 WL 728678, at *2–4 (S.D.N.Y. Sept.17, 1999); *In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 809–17 (N.D.Ohio 1999); *In re Nice Systems Sec. Litig.*, 188 F.R.D. 206, 219–21 (D.N.J. 1999); *Takeda v. Turbodyne Technologies, Inc.*, 67 F.Supp.2d 1129, 1136 (C.D.Cal. 1999); *Yousefi v. Lockheed Martin Corp.*, 70 F.Supp.2d 1061 (C.D.Cal. 1999); *see generally In re Milestone Scientific Sec. Litig.*, 183 F.R.D. 404, 417–18 (D.N.J.1998); *In re Party City Sec. Litig.*, 189 F.R.D. 91, 1999 WL 688195, at *20–22 (D.N.J. Aug.6, 1999).

hancing competition for lead plaintiff and lead counsel. As the court rightly stated in *In re Milestone Scientific Sec. Litig.*, 187 F.R.D. 165, 180 (D.N.J.1999), "the identification of the most adequate plaintiff may necessitate, and the [Reform Act] provisions encourage, competing motions for lead plaintiff and counsel."

In sum, the Commission does not believe that any and all mailings by attorneys to customers of broker/dealers are either so bereft of value or so prone to abuse that, absent clear direction from Congress, they warrant adoption of the interpretation of Section 15(c)(8) urged by NALPG.[30]

## CONCLUSION

For the foregoing reasons, the Commission urges the Court to hold that 15 U.S.C. 78*o*(c)(8) does not apply to the situations described in the Court's October 7, 1999 order.

Respectfully submitted,

Harvey J. Goldschmid

General Counsel

Eric Summergrad

Deputy Solicitor

Luis De La Torre

Attorney

Securities Exchange Commission

450 5th Street, N.W.

Washington, D.C. 20549–0606

Dated: November 10, 1999.

---

**30.** The Commission wishes to make clear that this memorandum, like the August 16, 1999 opinion in this case, is not "sanctioning the methods utilized by Weiss & Yourman" in forming a proposed lead plaintiff group. As noted, concerns about abuses in that process can be dealt with by other, more direct means.